507 A.2d 373

**NORWIN SCHOOL DISTRICT, Appellant,**

v.

**Joseph BELAN (Token Claimant), et al., Susan D. Berton, Linda Nemeth, Kathleen Zimmerman, Ellen Y. Lohr, Kathy Kunst, and the Pennsylvania Unemployment Compensation Board of Review, Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1985.

Decided April 7, 1986.

William Fearen, Michael I. Levin, Cleckner and Fearen, for appellant.

Ronald N. Watzman, Pittsburgh, for Joseph Belan.

Michael D. Alsher, Harrisburg, for Unemployment Compensation Bd. of Review.

Before NIX, C.J., and LARSEN, McDERMOTT, HUTCH-INSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

NIX, Chief Justice.

Once again we are faced with the question of whether employees involved in a work stoppage are eligible for unemployment compensation benefits under the terms of section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. 2897, *as amended,* 43 P.S. § 802(d) (1964). Today we are called upon to apply our test for eligibility, first enunciated in our decision in *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960), further expounded upon in *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968) and most recently articulated in *Local 730, United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. Commonwealth, Unemployment Compensation Board of Review,* 505 Pa. 480, 480 A.2d 1000 (1984), where an employer, Norwin School District ("Norwin"), offers to restore the status quo only upon the precondition that its teachers cease their work stoppage and return to work. This followed a determination that employer's unilateral action pursuant to a provision under a collective bargaining agreement between appellant, Norwin, and the Norwin Education Association ("NEA")[1] was inconsistent with that agreement, thereby amounting to an alteration of the status quo. For the reasons that follow, we affirm the order of the Commonwealth Court which upheld an award of benefits granted by the Unemployment Compensation Board of Review.

1. NEA is the labor organization that represents the full-time, part-time and long-term substitute employees employed by the Norwin School District. For purposes of bringing this action, appellee, Joseph Belan, President of the NEA, is representative for all employee members of NEA. (R. 101a) Appellees, Susan D. Berton, Linda Nemeth, Kathleen Zimmerman, Ellen Y. Lohr and Kathy Kunst, as short-term substitute employees of appellant, are not included within the definitional scope of employees covered under the collective bargaining agreement and are thereby not eligible for NEA membership. (R. 4a–6a)

■ The instant dispute arose when appellees, teachers employed by Norwin, having engaged in a work stoppage, were granted unemployment compensation benefits pursuant to a referee's decision.[2] The referee had reversed the decision of the Office of Employment Security ("OES") on the grounds that appellees' unemployment was the result of a labor dispute that constituted a lockout, 43 P.S. § 802(d) (1964). That decision,[3] affirmed by the Unemployment Compensation Board of Review ("Board"), was appealed to the Commonwealth Court which in turn affirmed the orders of the Board. *Norwin School District v. Commonwealth*

2. A question is raised in respect to the entitlement of named appellees Susan D. Berton, Linda Nemeth, Kathleen Zimmerman, Ellen Y. Lohr and Kathy Kunst to unemployment compensation benefits where the genesis of their work stoppage (i.e., improper unilateral action by appellants resulting in an alteration of the status quo) involves a collective bargaining agreement which does not cover these appellees. Section 1101.401 of the Public Employees Relations Act, 43 Pa. S. § 1101.301 *et seq.,* provides employees regardless of their exclusion from coverage under a labor agreement or membership in a labor organization with the right to engage in lawful concerted activities for purposes of collective bargaining or other mutual aid and protection. We conclude that when such uncovered employees are so engaged in lawful concerted activity in support of their represented counterparts, their entitlement to unemployment compensation benefits for purposes of section 402(d) of the Pennsylvania Unemployment Compensation Law derives from the same determination of how the work stoppage by the represented counterparts is characterized, i.e., strike or lockout. Such employees, although not covered or directly affected by the terms and provisions of a collective bargaining agreement, have a legitimate interest in the possible impact of such concerted activity on their own terms and conditions of employment.

3. The decision of the OES granted unemployment compensation benefits for the waiting week but denied benefits for the remaining weeks of the work stoppage for which appellees applied. That decision was appealed by both parties before a referee who affirmed the OES decision as to the waiting week, but granted benefits for the period covering the remainder of the work stoppage. The appellants filed an appeal of the referee's decision to the Board which was remanded to the referee for further testimony on the merits. On remand, the referee served as hearing officer for the Board. The referee once again awarded appellees unemployment compensation benefits. It is the Board referee's award of benefits for the work stoppage weeks following the waiting week period from which the instant appeal stems.

*of Pennsylvania, Unemployment Compensation Board of Review*, 80 Pa.Commw. 67, 471 A.2d 904 (1984).

## I.

A summary of the relevant facts as found by the Board's referee is as follows. On September 1, 1978 Norwin entered into a collective bargaining agreement with NEA which, by its terms, expired on August 31, 1981. Article XIX of that agreement contained, in pertinent part, the following provision:

Insurance Protection

A. Hospitalization

1. During the life of this contract, the Board [School Board] will provide to all eligible employes any of the hospitalization plans outlined and pay the full cost of premiums for any of the plans selected by the employe.

A. The major medical rider provided under Blue Cross and Blue Shield, *or equivalent coverage*, will be in the amount of $250,000.

B. Individual employe coverage—Blue Cross and Blue Shield prevailing fee "100" plan, *or equivalent*, with major medical rider. This plan will cover only the individual employe.

C. Parent and child (or children)—Blue Cross and Blue Shield prevailing fee "100", *or equivalent*, with major medical rider. . . . (emphasis added)

D. Family Plan Coverage—Blue Cross and Blue Shield prevailing fee "100", *or equivalent*, with major medical rider. . . .

G. *All Master policies held by the Board provided for in this Agreement, shall be considered part of this contract. It is agreed that if another carrier can provide and guarantee equivalent benefits as stipulated in the present policies in effect on the signing date of this Agreement, the Board may change carriers.* (emphasis added)

Pursuant to this provision appellants contracted with Blue Cross of Western Pennsylvania to provide medical and health care coverage for those employees covered under the agreement.

On September 15, 1980, a resolution was passed by Norwin that the Blue Cross/Blue Shield policy, then held by Norwin, be replaced by a self-insured plan with equivalent coverage as of July 1, 1981. In response to Norwin's resolution, NEA filed a grievance on September 17, 1980, contending that the health coverage being considered was not equivalent to Blue Cross/Blue Shield and thus a violation of the existing agreement. The grievance was ultimately submitted to arbitration and heard on March 26, 1981.[4] In the interim, negotiations over a new collective bargaining agreement began in January, 1981 between NEA and Norwin.

In April 1981, Norwin adopted a resolution which substituted a plan called Alpha Health Care Plan of the Pennsylvania School Boards Association ("Alpha") for the Blue Cross/Blue Shield coverage to be made effective July 1, 1981 and in fact was implemented on that date. Norwin notified Blue Cross/Blue Shield that the policy which had been in effect would cease as of June 30, 1981.

On August 18, 1981 a second hearing before the arbitrator was held with both parties in attendance. Cognizant that the August 31, 1981 expiration date of the contract was approaching, NEA verbally advised Norwin that it would continue to work beyond the contract expiration date provided that Norwin maintain the same terms and conditions that existed prior to the implementation of Alpha. On August 24, 1981 the arbitrator issued his decision and award, sustaining the grievance and ordering Norwin to immediately reinstate Blue Cross/Blue Shield or coverage which meets the criteria of Article XIX, subparagraph G of

4. Since appellant had not adopted any of the proposed health plans by March 26, 1981, the arbitrator issued an interim report retaining jurisdiction until such a plan was adopted.

the collective bargaining agreement. A mailgram notifying Norwin of the decision was sent the same day.

During a brief negotiation session held on August 29, 1981, Norwin notified NEA that it would appeal the arbitrator's decision thus indicating that it did not intend to comply with the provisions of the arbitrator's award. At the same session, NEA responded by informing Norwin that it would file an unfair labor practice charge[5] in view of the change in the status quo resulting from Norwin's unilateral implementation of Alpha and from Norwin's refusal to comply with the provisions of the arbitrator's award. Later that day NEA sent Norwin the following mailgram:

The Members of the Norwin Education Association are willing to continue working for a reasonable period of time under all terms and conditions of the existing Collective Bargaining Agreement while negotiations continue.

Not having heard from Norwin by the August 31, 1981 contract expiration date, the work stoppage commenced on September 1, 1981. On September 6, 1981 Norwin responded to NEA's proposal by mailgram stating:

The Board accepts this offer and will maintain the status quo and will reinstate Blue Cross/Blue Shield coverage

---

**5.** The Public Employees Relation Act ("PERA"), Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.301 *et seq.,* defines, in relevant part, the following acts by public employers as unfair labor practices.

Section 201 of Article XI

Unfair practices by public employers; acts prohibited

(a) Public employers, their agents or representatives are prohibited from:

(1) *Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.*

. . . . .

(5) *Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.*

. . . . .

(8) *Refusing to comply with the provisions of an arbitration award deemed binding under section 903 of Article IX.*

. . . . .

43 Pa. S. § 1101.1201 (emphasis added)

pending your advice that members will return to the classroom as you indicate.

Notwithstanding that Norwin was aware of NEA's desire to have its members continue working under the terms and provisions of the expired contract during the negotiations, Norwin was unwilling to provide the union members with the Blue Cross/Blue Shield coverage contained in the expired agreement *until after the teachers returned to work.*[6] A new collective bargaining agreement was eventually reached between Norwin and NEA on October 30, 1981. Pursuant to that agreement, Blue Cross/Blue Shield coverage was restored on November 1, 1981 and all teachers returned to work on November 3, 1981.

## II.

We must first set forth the scope of review of orders of the Unemployment Compensation Board of Review. We have previously acknowledged that such scope of review is limited by the Act of December 5, 1936, P.L. (1937) 2897, § 510, *as amended,* 43 P.S. § 830 which states, "In any appeal to ... [a reviewing court] ... the findings of the Board [Unemployment Compensation Board of Review] or referee, as the case may be, as to the facts, if supported by the evidence and in the absence of fraud, shall be conclusive...." *Philco Corp. v. Unemployment Compensation*

---

6. On or about September 6, 1981, appellant contacted Blue Cross/Blue Shield of Western Pennsylvania to determine whether coverage could be placed in effect immediately and was informed that the process could begin with a telephone call request, followed by a written request, and the receipt of the first premium payments which, in turn would then make coverage retroactive to the date of the original telephone call. On September 10, 1981, Blue Cross/Blue Shield notified appellant that it would agree to underwrite appellant's health plan coverage for NEA members effective 12:01 a.m. on the date of appellant's notification.

Although the language of appellants' written communications to NEA may have been ambiguous, their actions made it clear that it was their intention to require the teachers return to the classroom as a condition precedent to the restoration of the Blue Cross/Blue Shield benefits. This is the only reasonable conclusion to be drawn from the record, since NEA had at all times expressed the willingness of their members to work upon receiving the proper insurance coverage.

*Board of Review, supra,* 430 Pa. at 104–05, 242 A.2d at 456. *See also Progress Manufacturing Co. v. Unemployment Compensation Board of Review,* 406 Pa. 163, 167, 176 A.2d 632, 634 (1962); *Vrotney Unemployment Compensation Case, supra,* 400 Pa. at 445–46, 163 A.2d at 94. It is a well established principle that an appellate court should accept the facts and findings of an administrative agency which are supported by legally sufficient evidence, absent any clear errors of law or abuse of discretion. *Ramey Borough v. Commonwealth, Department of Environmental Resources,* 466 Pa. 45, 351 A.2d 613 (1976); *Williams v. Commonwealth, State Civil Service Commission,* 457 Pa. 470, 327 A.2d 70 (1974); *Commonwealth v. Harmar Coal Co.,* 452 Pa. 77, 306 A.2d 308 (1973), appeal dismissed, 415 U.S. 903, 94 S.Ct. 1395, 39 L.Ed.2d 460 (1974); *Triolo v. Exley,* 358 Pa. 555, 57 A.2d 878 (1948); *Commonwealth v. Leon E. Kocher Coal Co.,* 9 Pa.Commw. 110, 305 A.2d 784 (1973). *See generally,* K. Davis, Administrative Law §§ 25 *et seq.* at 525 *et seq.* (1972). When an action of an administrative agency meets those requirements we will not substitute our judgment for that of the agency.

■ The question of whether a work stoppage was caused or perpetuated by the union or by management, for purposes of determining employee eligibility for unemployment compensation benefits, is a mixed question of law and fact. *Philco Corp., supra; Vrotney Unemployment Compensation Case, supra.* Thus, in reviewing such a decision, the appellate court must make an independent determination. *Republic Steel Corporation v. Workmen's Compensation Appeal Board,* 492 Pa. 1, 421 A.2d 1060 (1980).

### III.

A determination of whether the two health plans were equivalent within the meaning of Article XIX is essential for ascertaining whether the status quo was maintained as required by our holding in *Appeal of Cumberland Valley*

*School District, Etc.,* 483 Pa. 134, 394 A.2d 946 (1978).[7] It necessarily follows if the substituted health plan, unilaterally instituted by Norwin, was not equivalent within the meaning of Article XIX, that Norwin must be charged with disturbing the status quo. This determination will ultimately resolve whether appellees' work stoppage was a strike or a lockout for purposes of eligibility of benefits under section 402(d) of the Pennsylvania Unemployment Compensation Law.

Section 402(d) of the Pennsylvania Unemployment Compensation Law provides in relevant part the following:

> An employe shall be ineligible for compensation for any week—
>
> (d) In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed....
>
> 43 P.S. § 802(d) (1964) (emphasis added).

Pursuant to this provision it is incumbent upon the Board to first resolve whether the work stoppage is the result of a labor dispute other than a lockout before it can make a determination of ineligibility for compensation. The test for determining whether a work stoppage is the result of a lockout or a strike is well-established:

7. In *Appeal of Cumberland Valley School District,* 483 Pa. 134, 394 A.2d 946 (1978), we held that a public employer violated its duty to bargain under the Public Employees Relation Act, *supra,* by unilaterally discontinuing payment for various insurance benefits and other terms and conditions of employment that were provided in the parties' expired collective bargaining agreement. This principle has been commonly referred to as the Cumberland Doctrine. Federal decisional law, from which this principle was derived, follows the same rationale. *NLRB v. Katz,* 369 U.S. 736, 744, 82 S.Ct. 1107, 1112, 8 L.Ed.2d 230 (1962); *Hinson v. NLRB,* 428 F.2d 133 (8th Cir.1970); *Borden, Inc. v. NLRB,* 196 NLRB No. 172, 80 LRRM 1240 (1972). This basic policy was designed to encourage the continuation of the work relationship for a meaningful and reasonable period of time under terms previously and mutually agreed to by the parties during the difficult period between the expiration of the old agreement and before the new terms of employment have been agreed upon. *Id.; Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960).

Have the employees offered to continue working for a reasonable time under the preexisting terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout"....

*Vrotney Unemployment Compensation Case, supra,* 400 Pa. at 444–445, 163 A.2d at 93–94 (1960).

Here, the Board found Norwin's Alpha plan to be not equivalent to the preexisting Blue Cross/Blue Shield coverage. Thus, the Blue Cross/Blue Shield coverage constituted the status quo in respect to appellees' health care coverage under the parties expired collective bargaining agreement. Norwin had a duty not to unilaterally disturb status quo conditions under the expired collective bargaining agreement while negotiations continued.[8] Only in the event

8. Norwin suggests that a distinction exists between the characterization of a work stoppage that occurs as a result of an alleged unilateral change violation during the term of a collective bargaining agreement and a work stoppage that is the result of an alleged unilateral change after the collective bargaining agreement has expired. Norwin contends that in the former situation, as in the instant case, the remedy is exclusively through the grievance arbitration procedures. In the latter situation the union may resort to a work stoppage. Norwin argues that the work stoppage should be properly characterized as a *strike,* since NEA did not pursue the available grievance arbitration procedure to completion. Norwin cites *Westinghouse Electric v. Unemployment Compensation Board of Review,* 187 Pa.Super. 391, 144 A.2d 673 (1958); *Arbechesky Unemployment Compensation Case,* 174 Pa.Super. 217, 100 A.2d 396 (1953); *Byerly Unemployment Compensation Case,* 171 Pa.Super. 303, 90 A.2d 322 (1952) and *Burkes v. Unemployment Compensation Board of Review,* 43 Pa.Commw. 521, 402 A.2d 731 (1979), for this proposition.

This analysis ignores two critical factors not found in the authorities cited. In this case NEA had pursued the grievance procedure and received a favorable award. Moreover, NEA continued to work until the expiration of the collective bargaining agreement. *Cf. Burkes, supra* at 527, 402 A.2d at 734 (basis of labor dispute found unrelated to disturbance of status quo occurred after collective bargaining agreement had expired). Norwin's theory would require that the

of an impasse during the collective bargaining process is an employer relieved of this duty. Norwin has not raised on appeal nor does the record reflect that Norwin's bargaining obligation was extinguished by a bargaining impasse.[9] *Pennsylvania Labor Relations Board v. Williamsport Area School District,* 486 Pa. 375, 406 A.2d 329 (1979). In fact, negotiations continued until a new agreement was ultimately reached. *See, Local 730 v. Unemployment*

employees would continue to work in spite of the favorable arbitration award, which under the terms of PERA was binding upon both parties, after the expiration of the prior agreement. The underlying objective to be achieved in this situation is to avoid, if possible, a work stoppage during the difficult period between the expiration of the old contract and the agreement upon the terms of a new one. To inequitably assess the obligation between the negotiating parties would certainly not foster that objective. The theory of the cases cited is applicable to instances where there was a binding agreement in effect when the work stoppage was initiated and the employees did not avail themselves to the procedural remedies set forth in the existing collective bargaining agreement. *See Westinghouse Electric, supra,* 187 Pa.Super. at 396-7, 144 A.2d at 676 (employees engaged in work stoppage before exhausting the grievance procedure as outlined in the existing collective bargaining agreement); *Arbechesky, supra,* 174 Pa.Super. at 222-3, 100 A.2d at 399 (employees engaged in work stoppage without first submitting the dispute to the arbitration procedure established by the union-management contract); *Byerly, supra,* 171 Pa.Super. at 309-10, 90 A.2d at 326 (dispute could have been settled by exhausting all remedies under the contractual provisions relating to the settlement of disputes). To extend that situation to the instant case would represent a clearly inequitable assignment of the responsibility to maintain harmony during a labor dispute.

9.  The definition of an "impasse" is that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless—but its application can be difficult. Given the many factors commonly itemized by the [National Labor Relations] Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a "state of facts in which the parties, despite the best of faith, are simply deadlocked."

An employer may, after bargaining with the union to a deadlock or impasse on an issue, make unilateral changes that are reasonably comprehended within his pre-impasse proposals. . . . Another formulation is that after an impasse reached in good faith, "the employer is free to institute by unilateral action changes which are in line with or which are no more favorable than those it offered or approved prior to impasse.

R.A. Gorman, Basic Text in Labor Law, Unionization and Collective Bargaining, at 445–7 (1976) (citations omitted).

*Compensation Board of Review, supra,* 505 Pa. at 489, n. 5, 480 A.2d at 1005, n. 5.

Norwin's primary argument is that the Board's determination that the Alpha health plan was not equivalent to the Blue Cross/Blue Shield plan was not supported by substantial evidence. Norwin contends that the Board misconstrued the intent of Article XIX of the contract and that the Board's conclusion results from a misinterpretation of subparagraph G of Article XIX. In essence appellant alleges that the Board's comparison of the plans was directed at equivalent "carriers" rather than equivalent "coverage." For the reasons set forth below, we disagree with this contention by Norwin.

■ After reviewing the record of the Board's findings we find substantial evidence to support the Board's conclusions.[10] The record herein is replete with testimony before the Board's referee on the issue of whether the two health plans were equivalent. For example the record reveals that an agent for the Alpha plan provided undisputed testimony that the Alpha plan resulted in a five hundred dollar ($500.00) deductible in the event of a conversion to individual coverage whereas the Blue Cross/Blue Shield conversion provision required no deductible (R. 321a). Also, Blue Cross maintained contractual agreements with participating hospitals in Western Pennsylvania (the geographical location of the Norwin School District) which obligated those hospitals to accept Blue Cross/Blue Shield as payment in full for services rendered to a covered patient. By contrast, the Alpha plan contained no such contractual arrangements

10. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Clites v. Township of Upper Yoder,* 506 Pa. 349, 354, 485 A.2d 724, 726 (1984), quoting *Republic Steel Corporation v. Workmen's Compensation Appeal Board,* 492 Pa. 1, 5, 421 A.2d 1060, 1062 (1980). As noted in *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985):

Our duty is to determine only whether or not the [Board's] findings are supported by substantial evidence; we may not substitute our judgment for that of the [Board] nor may we indulge in the processes of weighing evidence and resolving conflicting testimony. *Id.,* 507 Pa. at 436, 490 A.2d at 809 (citations omitted).

with the area hospitals, thus allowing for the possibility that the patient would be required to expend additional monies for the treatment received (R. 386a). These examples, along with other factors outlined in the record, provide substantial and persuasive evidence to support the Board's conclusion that the two health plans were not equivalent.[11]

We likewise find no support for Norwin's contention that the Board improperly focused upon the "carrier" rather than the "coverage". The above cited examples clearly show that the Board focused upon the equivalency of *coverage* and not upon whether the *carriers* were equivalent or identical. The findings of the Board clearly substantiate significant differences in coverage which justified the conclusion that subsection G of Article XIX had, in fact, been violated by the unilateral action of the employer. Moreover, it is equally clear that the cessation of work resulted from Norwin's failure to provide health coverage pursuant to the terms of the expired contract.

Norwin also suggests that the Board improperly delegated its responsibility by relying upon the finding of the arbitrator which concluded that the Alpha Health Plan coverage was not equivalent to the Blue Cross/Blue Shield coverage. On its face, this argument is spurious. While it is true that the arbitrator found that subsection G of Article

11. Other areas where the two health plans were found to be not equivalent included the following: (1) Treating physicians under the Alpha Plan have no obligation to accept payment in accordance with the set UCR (usual, customary and reasonable) fee schedule. Any balance due is the responsibility of the subscriber. Under Blue Cross/Blue Shield the participating physician is obligated by contract to accept the UCR fee schedule agreed upon under the provisions of the coverage; (2) The two health coverages have similar provisions for internal appeal of a claim denied in whole or part. However, Alpha, being a trust, has no right of appeal beyond the administrator of the trust to the Commonwealth Insurance Commissioner as there is with Blue Cross/Blue Shield. Blue Cross/Blue Shield is directly under the jurisdiction of the Insurance Commissioner. The Insurance Department Act, Act of May 17, 1921, P.L. 682, 40 P.S. § 751 *et seq.;* and, (3) Appellant, as a participant in the Pennsylvania School Board Association, has access to claims and medical information of employees covered by its Alpha Trust health plan. This same information is considered confidential by Blue Cross/Blue Shield and is not available to appellant and other participating school districts.

XIX had been violated, the record makes clear that the Board's referee made an independent determination of the issue.

Norwin's argument is based upon a decision of the Superior Court which held that a finding of an arbitrator is not binding on the Board. *See Gagliardi Unemployment Compensation Case,* 186 Pa.Super. 142, 141 A.2d 410 (1958).[12] Thus, even accepting the soundness of the Superior Court's reasoning in *Gagliardi,* that decision is in no way in conflict with what occurred in this case. The abdication of responsibility focused upon in *Gagliardi* was not present in the instant case.

█ Moreover, the decision in *Gagliardi* is not to be interpreted as suggesting an arbitrator's determination under section 903 of the Public Employees Relations Act cannot be relied upon by the Board in determining what the terms of the contract in question provided. The arbitration of disputes as to the interpretation of the provisions of the collective bargaining agreement is mandatory.[13] The parties to that agreement are thereby bound by that interpretation. *Wyoming Radio, Inc. v. National Association of*

**12.** In *Gagliardi* claimant was discharged by his employer for alleged willful misconduct. An arbitrator's award reinstated him without back pay. Claimant then applied for unemployment compensation which was refused by the Bureau. After a full hearing, the referee made findings of fact and agreed with the Bureau's conclusion. Upon appeal by the claimant to the Board of Review, it reversed the referee, ignoring his findings and basing its conclusions in respect to eligibility of unemployment compensation benefits upon the arbitrator's decision concerning claimant's proper discharge.

**13.** Article IX of the Public Employees Relations Act provides in relevant part:
Section 903
Disputes under collective bargaining agreement; mandatory arbitration
*Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree.* Any decisions of the arbitrator or arbitrators requiring legislation will only be effective if such legislation is enacted:
43 Pa.C.S. § 1101.903 (emphasis added, footnotes omitted).

*Broadcast Employees and Technicians*, 398 Pa. 183, 157 A.2d 366 (1960). This in no way intrudes upon the Board in the exercise of its responsibility to determine the entitlement of benefits under the Unemployment Compensation Law. Its role is to determine whether the contract was violated by the unilateral action of the employer, as opposed to interpreting the meaning of a term of the contract. It is not inconsistent with the Board's function to require it to accept the interpretation of the contract as determined in accordance with the section 903 binding arbitration decision.[14]

We thus conclude that in the instant case either of the above grounds forces the conclusion that Norwin's unilateral adoption of the Alpha plan resulted in a change in the status quo and that the unilateral change precipitated the work stoppage.

## IV.

■ We next address Norwin's contention that even if it did disrupt the status quo, it nevertheless restored the status quo on September 6, 1981 when the School District sent a mailgram to the union offering to reinstate Blue Cross/Blue Shield coverage pending the return of the teachers to the classroom. Norwin correctly notes that a determination as to the party responsible for the initial disruption of the status quo does not end the inquiry. *High v. Commonwealth, Unemployment Compensation Board of Review*, 505 Pa. 379, 479 A.2d 967 (1984). In *High* we held that a week by week analysis must be made of the cause

---

14. Although there is indication that the Norwin School District filed a petition for review of the arbitrator's decision on Sept. 18, 1981, in the Court of Common Pleas of Westmoreland County, to date Norwin has not sought resolution of that appeal. Moreover, it appears that an appeal of this award would have been to no avail since this Court has limited its review of binding arbitration awards to that of a narrow certiorari where the award is alleged to be illegal under the laws of the Commonwealth. *City of Washington v. The Police Department*, 436 Pa. 168, 259 A.2d 437 (1969). We will not disturb the arbitrator's decision if it can be lawfully carried out. *Id.* In the instant case the arbitrator made a lawful determination when he concluded that the Alpha plan was not equivalent to the Blue Cross/Blue Shield plan.

for the work stoppage during that particular time frame. *Id.* In the instant case, a week by week analysis leads us to reject appellants argument that its notification to NEA that it would reinstate Blue Cross/Blue Shield *if* the teachers first return to the classroom, did in fact constitute a restoration of the status quo by appellants. This case is factually distinguishable from *High v. Commonwealth, Unemployment Compensation Board of Review, supra.*

In *High* the unilateral action on the part of the School District took the form of lengthening the teachers' work day after expiration of the collective bargaining agreement with the union. As in the instant case, the union agreed to continue working after the expiration of the contract if the School District maintained the same terms and provisions of that expired agreement.[15] The School District nevertheless implemented the longer work day and the work stoppage began. Two days later the School District offered to return to the shorter work day that existed under the expired collective bargaining agreement, but the union rejected the offer and the teachers remained out on strike. In *High* there was nothing further necessary on the part of the School District to restore the status quo aside from their notification to the teachers that they could work the shorter day as it existed under the expired contract. It then became incumbent on the union to fulfill its obligation to return to work under the terms of the expired collective bargaining agreement and work the shorter day. Thus, under the facts of *High*, we found the responsibility of that continued work stoppage by the refusal of the teachers to return to work, lay with the teachers, thereby converting the lockout into a strike.

A different situation is presented in the instant case. The NEA had expressed its willingness, even prior to the expira-

15. See, *Unemployment Compensation Board v. Sun Oil Co.,* 476 Pa. 589, 383 A.2d 519 (1978) and *Vrotney Unemployment Compensation Case, supra,* where we held that such offers by employees to continue working under the preexisting terms and conditions of employment contained in their most recently expired contract, to be a prerequisite to determining whether a work stoppage is a lockout.

tion of the earlier contract, to continue to work provided that the Blue Cross/Blue Shield coverage was restored. Moreover, the teachers did in fact continue working from the time of the unilateral change on July 1, 1981 until one week after the arbitrators decision on August 24, 1981. The only act required to end the work stoppage was the restoration of the prior health benefits coverage. When an employer has within its sole and complete control the ability to restore preexisting terms and conditions of employment, all that is required is that the employer in fact take such necessary action to restore the status quo.

An offer of restoration alone is not sufficient where no action on the part of employees is necessary to restore the status quo which the employer unilaterally disrupted. We cannot agree that a precondition requiring the employees to return to work is consistent with the restoration of the status quo herein. As the Board of Review stated:

> [B]eing the party which disturbed the status quo, the employer bears the responsibility for re-establishing the status quo.
>
> Decision and Order of the Unemployment Compensation Board of Review (*Joseph Belan, et al.*, No. B–209912,6, Sept. 17, 1982.)

Here, although the employer advised the employees on September 6, 1981 that it would reinstate the Blue Cross/Blue Shield coverage, it did not until after a new Labor-Management Agreement was reached on October 30, 1981. All that was necessary for reinstating coverage was for the employer to make a phone call. *See supra* note 6. Instead, appellant insisted that the employees first return to the classroom.

Therefore, under the *Vrotney* standard, appellant's conditioning their provision of Blue Cross/Blue Shield coverage upon NEA members' return to work, did not convert appellant's lockout into a strike by appellees for purposes of eligibility for unemployment compensation benefits under 402(d) of the Pennsylvania Unemployment Compensation Law. *High v. Unemployment Compensation Board, su-*

*pra.* Thus the Board was correct in its determination that the work stoppage was due to a lockout and that appellees were entitled to benefits.

Accordingly, the Commonwealth Court Order affirming the Unemployment Compensation Board of Review is affirmed.

FLAHERTY, J., did not participate in the consideration of this case.

ZAPPALA, J., files a concurring opinion in which LARSEN, J., joins.

McDERMOTT and HUTCHINSON, JJ., files a dissenting opinion.

ZAPPALA, Justice, concurring.

I concur in the result. Although I find the language of the analysis unnecessarily broad, I agree that the terms and conditions of employment under the collective bargaining agreement which expired on August 31, 1981 (the "status quo") included Blue Cross/Blue Shield coverage. Because the employees offered to continue working for a reasonable time under these terms, and the employer refused to take the action necessary to preserve this "status quo", the work stoppage constituted a lockout. Moreover, I continue to adhere to the views expressed in the Dissenting Opinion in *High v. Unemployment Compensation Board of Review,* 505 Pa. 379, 479 A.2d 967 (1984).

[T]he conclusion that "a work stoppage which is initially a strike may be subsequently converted into a lockout" or vice versa, simply does not follow from the premise that "each week of unemployment is the subject of separate claim, the validity of which is determined by a consideration of conditions existing within that week." I agree that the statute requires that each week of unemployment is the subject of a separate claim. I disagree, however, that this statutory requirement provides a basis for the conclusion that the work stoppage in this case was converted from a lockout to a strike. *Whether a work*

*stoppage is a lockout or a strike is determined by the circumstances that caused the stoppage in the first instance.*

505 Pa. at 387–88, 479 A.2d at 971 (Larsen, J., dissenting) (emphasis added).

LARSEN, J., joins in this concurring opinion.

McDERMOTT, Justice, dissenting.

The Board offered to restore the status quo by reinstating the Blue Cross/Blue Shield coverage if the teachers returned to work. The teachers wanted Blue Cross/Blue Shield reinstated before they returned to work. The impasse continued for two months of the most educable period of the lives of the children held hostage by the puerile actions of both parties. Nothing but loss is reflected by this litigation. Now we make the teachers whole at the expense of the unemployment compensation fund because they did not get what they wanted the day they wanted it, notwithstanding that they had an enforceable decision of the arbitrator and an enforceable offer of the Board the minute they returned. I dissent and would leave them where they put themselves, with the hope that the children they are charged to teach show more maturity in their lives and business.

HUTCHINSON, Justice, dissenting.

I dissent. I believe that Mr. Chief Justice Nix's opinion announcing the judgment of the Court presents another chapter in the twisted development of the doctrine of "lockout" in this Commonwealth as it relates to the Unemployment Compensation Act.[1] Since our decision in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960), we have allowed the term "status quo ante" to be distorted and strained almost beyond recognition. In the process, I believe that we have created an unworkable and illogical standard. Originally adopted as a guideline for decision on the issue, it has become a talismanic substitute

1. Act of December 5, 1936, P.L. 2897, *as amended,* 43 P.S. §§ 751–914.

for the judicial discrimination which is needed to apply the statutory distinction to specific cases. Indeed, the guideline adopted to serve the legislative intent has mastered the meaning of the word lockout which the statute uses. A review of our decisions illustrates this development.

In *Vrotney*, the union sought wage and benefit increases totaling fourteen cents per hour. The company offered six cents per hour and the elimination of all incentive pay. The record showed that most workers would lose money under the company's plan. The union offered to continue working under the old contract; the company refused and implemented the new scheme. We held that the "status quo ante" was the old contract and found a lockout because the company refused the union's offer to continue working under it. Subsequently, in *Unemployment Compensation Board v. Sun Oil Co.*, 476 Pa. 589, 383 A.2d 519 (1978), the company agreed to an extension of the existing contract. After five weeks the company implemented certain changes and planned to implement others. The union then voted to strike. We held that even five weeks after its expiration the contract requirements defined the "status quo ante." The company's unilateral modification of this contractually defined "status quo ante" created a lockout. We did not expressly consider whether this resulted from a legal requirement that the contract and all its terms remain in effect for unemployment compensation purposes, or whether the parties' extension of its provisions froze the "status quo ante." There is a difference between continuing the contract and preserving the *status quo*. In *Fairview School District v. Commonwealth, Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517 (1982), we again failed to address that difference. After the contract there expired, the school board and the union agreed to work for sixty days as under the old contract. Teachers were paid at the levels in effect on the last day of the expired contract. The union claimed, however, that increased wages extrapolated from the wage increase schedule in the expired contract should be paid to the

teachers. We held that the "status quo ante" was the compensation in effect at the contract's expiration, not the increased compensation which would result from wage increases extrapolated from the expired contract. Since the "status quo ante" existing before the work stoppage was maintained, we held the teachers were on strike, not locked out. Finally, in *Local 730 v. Commonwealth, Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984), the union and company agreed to continue working under the old contract until June 15. On June 18, the company implemented a new wage and benefit plan which improved the workers' compensation. Work continued under the increases until July 20 when the union voted to strike. The majority held that the "status quo ante" was the expired contract and, by improving the compensation package, the company disturbed it. Thus, we held that the workers were locked out because their employer increased their compensation. Today Mr. Chief Justice Nix states that the "status quo ante" is not the wage and benefit package in place when the contract expired, but the package that should have been in effect. The term has thus come full circle. It no longer means the conditions in the workplace before a work stoppage, but those conditions which are administratively or judicially found to be proper by contract or custom.

These *ad hoc* determinations of the "status quo ante" strip the doctrine of stability and predictability. Collective bargaining is a complex process of balancing risks against benefits. The least we owe the parties are clear standards to predict the legal effect of their actions. In an effort to bring some stability to the application of the unemployment compensation law to collective work stoppages, I would hold that the "status quo ante" distinguishes a strike from a lockout when the employer unilaterally changes it to the employees' detriment. I would define the "status quo ante" as the situation actually in effect at the contract's expiration, without regard to what would have happened if the contract had continued in force. In this case, that actual

situation included the Board's health plan, not the plan the arbitrator awarded. This definition seems to me to best serve the purposes of the Unemployment Compensation Act to compensate those who are out of work through no fault of their own, with minimal impact on the ongoing bargaining process.

I must also disagree with Mr. Chief Justice Nix's conclusion that this work stoppage, if it began as a lockout, was not converted into a strike by the Board's offer of September 6, 1981 to reinstate Blue Cross/Blue Shield coverage upon the teachers' return to work. The Chief Justice says that the lockout was not converted into a strike because the teachers had to return to work before Blue Cross/Blue Shield coverage was restored. If, however, coverage had been restored first the lockout would have been converted into a strike.

I believe that this is an overly technical semantic distinction, and largely undermines our holding in *High v. Unemployment Compensation Board of Review*, 505 Pa. 379, 479 A.2d 967 (1984). In *High*, we held that a lockout could be converted into a strike if the reason for the work stoppage changes, and that determination should be made on a weekly basis. We said, "The policy of Section 402(d) [of the Unemployment Compensation Law] is one of discouraging employers or employees from initiating or continuing work stoppages[.]" *Id.*, 505 Pa. at 383, 479 A.2d at 969. Here the Board tried to end a work stoppage. Whether Blue Cross/Blue Shield coverage was reinstated before the workers' return or upon their return, to my mind, misses the point. The Board took steps to end this work stoppage. Had the teachers accepted, they would have returned to work with the Blue Cross/Blue Shield coverage. Mr. Chief Justice Nix states that the lack of this coverage justified treatment of the work stoppage as a lockout. It was in their power to grasp the hand held out and act in the interest of the real victims of this imbroglio, the students. The question of which comes first seems trivial to me. Such an analysis only injects more pettiness and triviality

into the serious business of collective bargaining, without serving the purpose of Section 402(d), to compensate employees who are out of work because their employer locked them out of their place of employment when they refused to take a cut in pre-existing pay, benefits or privileges. As such, it interferes with the applicable statutes on collective bargaining and offers no help in determining who, among those engaged in a collective work stoppage, are entitled to collect benefits because they are merely trying to maintain what they have against economic coercion and those who are not because they have voluntarily withheld their labor in order to extract more by the same means.

Accordingly, I would reverse Commonwealth Court and hold that a lockout did not exist initially and that, in any event, the union's rejection of the School Board's offer of September 6, 1981 converted the work stoppage into a strike.