548 A.2d 360

Robert Orr, John Shedlock et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

46

*Ronald J. Zera,* with him, *William Lowman,* for petitioners.

No appearance for respondent.

*Kathryn Speaker MacNett,* with her, *Thomas J. Bender, Baskin, Flaherty, Elliott, Mannino & Beren, P.C.,* for intervenor, Canterbury Coal Company.

OPINION BY JUDGE MCGINLEY, September 26, 1988: Robert Orr and John Shedlock, lead tokens (Claimants) appeal an order of the Unemployment Compensation Board of Review (Board) reversing an

award of benefits on July 28, 1986, by the referee. Canterbury Coal Company (Canterbury) intervenes in this appeal.[1] The Board filed a notice of non-participation. We reverse the order of the Board.

The relevant facts, as found by the Board in both claims are as follows:

1. The claimant was last employed by Canterbury Coal Company as a mechanic for approximately 18 years with his last day of work being August 2, 1985.

2. The claimant is a member of and vice president of Local Union 6986 of the United Mine Workers of America, District 5.

3. The claimant is the representative claimant of Local 6986 of the in regards [sic] to the labor dispute occurring on August 5, 1985, at the Canterbury Coal Company work site DiAnne Mine.

4. The United Mine Workers of America and the Bituminous Coal Operator's Association, Inc., had entered into a union-management contract on June 7, 1981, with an expiration date of September 30, 1984.

5. The employer, Canterbury Coal Company had been a member of the Bituminous Coal Operator's Association, Inc., on June 7, 1981.

6. In September 1984, and prior to September 30, 1984, the United Mine Workers of America notified Canterbury Coal that a contract separate from the National Agreement would be negotiated among several companies of which Canterbury Coal was one.

---

[1] Canterbury had originally been a named party to the appeal. Pursuant to Pa. R.A.P. 1513(b) the reference to Canterbury was dropped. Canterbury then filed for permission to intervene to protect its party status.

7. Later in September, 1984, and still prior to September 30, 1984, the President of Canterbury Coal was given a copy of the separate agreement, signed same, and added an addendum regarding a rail siding issue and mailed it to the Washington, DC office of the United Mine Workers of America.

8. The United Mine Workers of America did not become a signatory to the contract.

9. On September 30, 1984, Canterbury Coal Company continued to offer work and the United Mine Workers of America accepted and continued to work beyond September 30, 1984, the expiration date of the contract, and to August 4, 1985, under the terms and conditions of the expired contract.

10. Negotiation meetings continued, of which there were 19 in number through the period of October, 1984 through June 5, 1985 with the employer's thrust to reduce the existing and expiring contract language and contents and the union holding fast to the terms of said contract, but collectively bargaining the new contract proposals.

11. On June 5, 1985, which is the last day of negotiation meetings, prior to the labor dispute, the company made an offer to the union.

12. The union, on June 5, 1985, rejected the employer's proposal.

13. The employer, on July 23, 1985, had meetings with its employees explaining its offered proposal of June 5, 1985.

14. Officials of the United Mine Workers of America, other than those who were employed at the Canterbury Coal work site, were not notified of the meeting of July 23, 1985, and accordingly, were not in attendance.

15. After nineteen (19) negotiating sessions and ten (10) months of bargaining, on July 27, 1985, the company, by letter, notified its employees that, 'effective 12:01 a.m., Monday, August 5, 1985, Canterbury will implement its final contract proposal. For the purposes of implementing certain provisions of this final contract proposal, the following will apply:

Article X—Wages and Attendance Productivity Bonus

—The period for the initial quarter will be from July 1, 1985 to September 30, 1985, however, the hours worked and the clean tons produced prior to August 5, 1985 will not be included in the calculations of productivity.

—Productivity for the remainder of this initial "quarter" will be measured in tons *produced*- rather than *shipped*.

Article IX(e)—Personal and Sick Leave

—For ease of administration, the reduction in personal or sick leave days from 5 to 4 will not take effect until January 1, 1986.

Article XIV—Graduated Vacation

—The Company intends to implement a Christmas shutdown beginning 12:01 a.m., Monday, December 23, 1985 and ending 12:01 a.m., Saturday, December 28, 1985. Those employees who do not have sufficient graduated vacation days shall be excused without pay for this 1985 Christmas shutdown.

Article XX—Health and Retirement Benefits

—The Company intends to implement its pension proposals as described in Appendix C at a future date so long as there is no disruption of operations. In the meantime, the Company will continue to participate in the existing pension

plans provided under the 1981 BCOA labor agreement.

Article XXII(i)—Attendance Control

—Unexcused absences which occurred prior to August 5, 1985 will not be counted for purposes of applying the Unexcused Absenteeism Control Plan.

Appendix B—Excessive and Chronic Excuses Absenteeism Policy

—For ease of administration of this new policy will become effective on January 1, 1986, based on the attendance records for the three previous years. Until that date the existing policy on excessive absenteeism shall apply.

Each of you is expected to work as scheduled starting August 5, 1985, under the terms and conditions of the Company's final proposal. If you have additional questions regarding these terms you should refer to the full text which was mailed to your individual home. For additional information contact your immediate supervisor or me directly.

I am confident that with a fresh start and the enthusiastic cooperation of all employees that Canterbury can regain its rightful position in the coal industry.'

16. The Union, Local 6986 installed pickets at the employer's site at 12:01 a.m. on August 5, 1985.

17. Continued work was available to the employees on August 5, 1985 under the terms and conditions of the employer's final proposal of June 5, 1985 and the provisions outlined in the employer's letter of July 27, 1985.

18. A stipulation was agreed upon at the time of the Referee's Hearing by all parties; Referee, Employer, and Union, that all appeals filed previous to the date of the hearing and thereafter

to the Canterbury Coal Company labor dispute which occurred on August 5, 1985, will be governed by this decision.

Generally, our scope of review is whether the Board's decision is in violation of the constitutional rights of petitioner, that it is not in accordance with law or that any finding of fact made by the Board and necessary to support its adjudication is not supported by substantial evidence. *Wertman v. Unemployment Compensation Board of Review,* 103 Pa. Commonwealth Ct. 376, 520 A.2d 900 (1987). However, because the question of whether a work stoppage was the result of a strike or lockout for the purposes of determining unemployment compensation benefits is a mixed question of law and fact, *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), "the appellate court must make an independent determination." *Norwin School District v. Unemployment Compensation Board of Review (Belan),* 510 Pa. 255, 264, 507 A.2d 373, 378 (1986).

Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), provides:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed. . . . (Emphasis added.)

In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960), the Pennsylvania Supreme Court established the test for determining whether a work stoppage is the result of a strike or lockout:

·Have the employees offered to continue working for a reasonable. time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending. the final settle- ·ment of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the .employer refuses to· so extend the expiring contract and maintain · the status quo, then the· resulting work stoppage constitutes a. 'lockout'. . . . .

*Id.* at 444-45, 163 A.2d at 93-94.

Claimants argue there is insufficient evidence. to support the Board's conclusion that the work stoppage was a strike and not a lockout.· Canterbury contends the status quo was maintained· for a reasonable time; herein, ten months; and that a·bargaining impasse was reached. Following *Vrotney,* Pennsylvania Courts have held that a union's offer to continue the pre-existing contract for an unspecified period, or for periods of 30, 60 or 90 days, constitutes a reasonable. extension offer under *Vrotney. Unemployment Compensation Board of Review v. Sun Oil,* 476 Pa. 589, 383 A.2d 519 (1978). Canterbury and the union worked under the expired 1981 Master Agreement (Employer's Exhibit No. 1) between the Bituminous Coal Operators Association and the United Mine Workers ·of America from October 1, 1984, to August 4, 1985. Negotiations for a new contract outside of the Master Agreement occurred from Octo- ber 4, 1984 through June 5, 1985, and included nine- teen separate negotiations. Canterbury's · bargaining thrust was ,to substantially. reduce production costs by increasing production .and· decreasing contract costs *be- low* the level of the, expired ·Master Agreement, while the union demanded the· existing contract levels (Find-

ing of Fact No. 10). On June 5, 1985, Canterbury made its last offer to the union which the union rejected. On July 5, 1985, a letter including the final proposal was prepared for Canterbury employees (Employer's Exhibit No. 19). On July 27, 1985, Canterbury notified its employees that work would be available under the terms of its final offer as of August 5, 1985.[2] At 12:01 a.m., August 5, 1985, the union installed pickets at the Canterbury work sites.

A claimant whose employment has been interrupted by a work stoppage arising out of a labor dispute bears the burden of proving that the stoppage resulted from a lockout. *Bishop v. Unemployment Compensation Board of Review*, 90 Pa. Commonwealth Ct. 553, 496 A.2d 110 (1985). Our Supreme Court has held that a bargaining impasse occurs where the parties have exhausted the prospect of concluding an agreement and further negotiations would be fruitless. *Norwin School District v. Unemployment Compensation Board of Review*, 510 Pa. 255, 507 A.2d 373 (1986). The record indicates that an impasse had not been reached; negotiations continued during the strike. Canterbury and union representatives met on November 18, 1985, and bargaining continued.

---

[2] Canterbury's letter stated in part:

Due to the extreme financial strain imposed by its inability to compete, Canterbury has no alternative but to implement its final proposal for a new labor contract. Each of you has had the opportunity to read and hear this final proposal explained. It is imperative that you understand the need for such a different arrangement.

Effective 12:01 a.m., Monday, August 5, 1985, Canterbury will implement its final contract proposal. . . .

(Employer's Exhibit No. 17 and Claimants' Exhibit No. 1.)

In fact, at the close of this bargaining session, future meeting dates were set.[3]

Furthermore, at the bargaining session on June 5, 1985, both parties were willing to meet before Canterbury would implement its final proposal (Employer's Exhibit, Minutes of Eighteenth Bargaining Session Between Canterbury Coal Company and UMWA Local Nos. 2456 and 6956 on June 5, 1985, at 16-17).

In *Local 730 v. Unemployment Compensation Board of Review*, 63 Pa. Commonwealth Ct. 195, 437 A.2d 1055 (1981), aff'd, 505 Pa. 480, 480 A.2d 1000 (1984), this Court held that neither party may issue an ultimatum altering the status quo after the contract has technically expired without bearing the responsibility for the resulting work stoppage. At the hearing President of Canterbury, Guvenc Argon (Argon), testified that his July 27, 1985, letter was an ultimatum and that Canter-

---

[3] Union representative Paul Lemmon to Canterbury representative, Jay Waks:·

P. Lemmon:  Of course, we're not in agreement with *all* your changes. Helpers, for example, and the arbitration language under (Article) three; these are not in the contract. Otherwise we have no problem giving you what the contract already says you have. I think we've come a long way today. Maybe it will bear some fruit in the future. Maybe we should meet on a more regular basis.

J. Waks:  It's not too difficult to do that, we haven't had a meeting since June 5th.

P. Lemmon:  I have no trouble if you send V. Zodiaco or J. Kernick down to Consol plaza and have them explain how it's done.

P. Lemmon:  Can we set some dates for future meetings?

J. Waks:  Let me give you a call after we have a chance to review your bonus proposal in more detail.

(Employer Exhibit, Minutes of Nineteenth Bargaining Session Between Canterbury Coal Company and UMWA Local Nos. 2456 and 6956 on November 18, 1985, at 9.)

bury would only accept work under the terms of his last offer.[4] Testimony also indicates that parties had not reached an impasse, contrary to Canterbury's assertions that the union never reduced their demands.[5] Testimo-

[4] William Lowman (Lowman) union's counsel, to Argon:

QCL: Mr. Argon, you had earlier testified that you issued a letter on July 27, 1985 is that a two page letter of which I am showing you a copy of right now?

AE: That's correct.

QCL: Now, just so the record is clear, you make a statement in this letter and I quote, 'each of you is expected to work as scheduled starting August 5, 1985, under the terms and conditions of the company's final proposal.' I would simply ask you this, if would you have taken the miners back under the 1981 agreement or were you making an affirmative comment in this letter that you would not take them back under any situation except under those proposals that you made?

AE: That letter is clear, it says that they would be accepted to work under the terms of the last final offer which they received a copy.

QCL: And that was the final offer that you had indicated in your earlier testimony?

AE: That's correct.

. . . .

QCL: So it is my understanding that Canterbury Coal did not wish as of August 5, 1985 to continue complying with the terms of the 1981 contract while negotiations were going on, is that a correct statement?

AE: Yes, Canterbury made it's final offer known to the UMWA at the June 5th meeting it was very confident that it could operate under those terms.
(Notes of Testimony, July 24, 1986, (N.T.) at 21-22.)

[5] Lowman to Argon:

QCL: Just answer my question, do you believe that the union has . . . .

AE: No. They come from that level down which they offered me to the '84 contract level if that's conceding that's an agreement I couldn't accept in the first place, so, that's the answer I would give you. They come from a higher level which was not acceptable to me.

ny indicates parties were still bargaining after August 5, 1985.[6]

Canterbury cites *Bedow v. Unemployment Compensation Board of Review*, 97 Pa. Commonwealth Ct. 192,

---

QCL: But the question I'm asking you, have they, over the course of negotiations, dropped some of their demands and lowered some of their demands during the course of . . . .

AE: To the level of the '84 contract.

QCL: To whatever level, have they been dropping their demands during the negotiation sessions. That's the only question I'm asking you.

AE: That's the answer I'm giving you. They lowered their higher demands to the '84 level which was not acceptable to me.

N.T. at 23.

[6] Lowman to Union Board Member Ken Horcicak:

QCL: Were picket lines set up?

ACU1: 12:01 a.m. August 5th.

QCL: Did the negotiations continue after this date?

ACU1: Yes they did.

QCL: Any other time after August 5, 1985, did the issue of working under the terms of the 1981 agreement come up?

ACU1: In either late October or early November, and I'm not clear, I know late October, early November 1985, we were in court on a DER, Department of Environmental Resources project that Canterbury was going to, wanted to work on, at that time Mr. Argon, after Court proceedings were over, Mr. Argon had expressed to do the DER work with people from UMWA. Under the auspices of the 1981 contract and he specifically mentioned the '81 agreement. We agreed to meet, I think two days later at a County Manor Hotel to finalize such an agreement . . .

QCL: Could you tell us who was present at this meeting for the employer?

ACU1: For the employer I believe it was Guvenc Argon, Mario Fazio, and Diana Boarts.

QCL: And then what transpired at the meeting?

ACU1: Management reniged [sic] on their offer two days previous to bring these people back under the '81

510 A.2d 152 (1986) in which this court explained that a long-term offer to continue work under the terms of an expired labor contract was not reasonable as it deprived the employer of the opportunity to negotiate for present relief from the old contract. *Bedow* is distinguishable. In that case our Court concluded that the union's offer to continue working under the expired contract was in actuality an offer to continue working for another three year term. Here, Canterbury, on June 5, 1985, and July 27, 1985, indicated an unwillingness to continue the status quo. The union expressed a desire to continue working under the terms and conditions of the 1981 Master Agreement, and a willingness to continue to negotiate.[7] The *Bedow* Court distinguished its situation

---

agreement, said we would, you know we have to change the terms, we can't give then [sic] work under the '81 agreement.

(N.T. at 29-30.)

[7] Lowman to Argon:

QCL: So the union did make it clear at that time, that they were willing at that time to work under the '81 agreement?

AE: That was the statement for them to work.

QCL: In fact, the union never, the union continued working under, after September 30, 1984, under the '81 contract with Canterbury?

AE: Yes they did.

QCL: And the union continued working up until August 5, 1985, when you by your letter of July 27, 1985, changed the conditions of the work place?

AE: Yeah, that was the result of 19 negotiating sessions though. And ten months.

QCL: And the union has never indicated to you in any shape manner or form that they were unwilling to continue working under the '81 agreement while negotiations were going on?

AE: No, there were times during the negotiations, it was told by Mr. Lemmon that we should hurry up because the membership is getting impatient.

from that in *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 12, 106 A.2d 652, 653 (1954), where claimants were not disqualified from benefits under Section 402(d), because the offer in *Leto* was to continue working under the existing agreement for "a year a month or even 15 days, to allow additional time for negotiation." The union agreed to work under the 1981 Master Agreement, not for another contract term as in *Bedow,* but while negotiations continued as in *Leto.*[8]

Accordingly, we reverse the Board's determination that Canterbury "did not refuse to extend the expired contract and permitted the employees to continue working under the terms of the expired agreement for more than a reasonable period." (Decision and Order of the Board, March 26, 1987, at 6)

## ORDER

AND NOW, September 26, 1988, the orders of the Pennsylvania Unemployment Compensation Board of Review at Decision Nos. B-256734 through B-256793 dated March 26, 1987, are hereby reversed.

---

QCL: But the question I asked you was the union never, was always at least as far as your knowledge, was always agreeable to working under the '81 agreement while negotiations were going on?

AE: There was no problem with that.

(N.T. at 23-24.)

[8] Lowman to Horcicak:

QCL: At all times from September 30, 1984, has the union been willing to work under the terms of the 1981 contract?

ACU1: To the best of my knowledge as district representative, yes.

QCL: Would you go back today, or would the locals go back today if Canterbury agreed to allow the 1981 contract to be in effect while the negotiation sessions continue?

ACU1: *If negotiation sessions continued,* yes.

(Emphasis added.) (N.T. at 30.)