547 A.2d 850

Babcock & Wilcox Company, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued March 21, 1988, before Judges BARRY and McGINLEY, and Senior Judge KALISH, sitting as a panel of three.

*Richard I. Thomas*, with him, *Richard R. Riese* and *Candace M. Buzzelli, Thorp, Reed & Armstrong*, for petitioner.

No appearance for respondent.

*Richard E. Gordon, Grossinger & Gordon*, for intervenors, employees/claimants.

OPINION BY JUDGE McGINLEY, September 20, 1988:

Babcock and Wilcox Company (Babcock) appeals a decision of the Unemployment Compensation Board of Review (Board), affirming a referee's decision granting unemployment compensation benefits to William B. Bosworth and John D. Boydell (lead tokens), Intervenors in this appeal, and other union employees of Babcock. We affirm.

The relevant facts, as found by the referee and adopted by the Board in both claims are as follows:

2. Claimant is the Lead Token Claimant regarding claims for Unemployment Compensation benefits filed on behalf of bargaining unit employees employed by the employer and represented by the United Steel Workers of America, Local 1082 (hereinafter called the union and/or Local 1082).

3. A three-year labor/management agreement between the employer and Local 1082 had an expiration date at midnight on August 16, 1986, and prior to said expiration date the union and the employer had engaged in negotiations; but no new labor/management agreement was reached as of August 16, 1986.

4. Babcock & Wilcox is a corporation and a wholly owned subsidiary of a parent corporation, McDermott, Inc., and the employer's Beaver Falls Works encompasses facilities and operating plants at Beaver Falls, Ambridge, and Koppel, PA.

5. There are some 3,300 bargaining unit employees employed at the employer's Beaver Valley Works, but as of September 10, 1986, approximately 2,000 employees were on layoff and approximately 1,300 were actively employed.

6. McDermott, Inc., has a number of subsidiary corporations and/or divisions; and Babcock & Wilcox was the only subsidiary or division that was losing money, and the employer herein had actually been losing money during the entire term of the three-year labor/management agreement that was expiring as of August 16, 1986; and the employer calculated its loss for August 1986 alone as $5,000,000 and its total loss for the aforesaid three-year period as being approximately $100,000,000.

7. Since Babcock & Wilcox was the only subsidiary and/or division that had been losing money, considerable pressure was being exerted by McDermott International for the subsidiary corporation to show a profit and/or reduce its losses and this pressure from the parent corporation was reflected by the employer in the labor/management negotiations hereinafter described.

8. In fact, as early as 1985 the employer had sought to terminate the existing three-year labor/management agreement and implement a $3.25 per hour wage reduction with a commitment by the employer of a capital investment of $185,000,000 (provided by McDermott Interna-

tional) wherein the facilities of Babcock & Wilcox would be improved and upgraded, but the union would not agree to same with the result that capital improvements were not effectuated, and the labor/management agreement continued in effect until its expiration date on August 16, 1986.

9. Babcock & Wilcox employees constitute some 5.5 per cent of the total work force of McDermott International; and Babcock & Wilcox revenues amount to six per cent of the total revenues of McDermott International.

10. In an attempt to reach a new labor/management agreement the parties commenced negotiating on July 16, 1986, and the employer made proposals at negotiating sessions on August 1, 13, 14, 15 and 16, 1986.

11. At all negotiating sessions the employer was asking for concessions in wage reductions and other areas and at all time material hereto the employer informed Local 1082 representatives that Babcock & Wilcox was losing money and needed concessions to remain competitive.

12. All of the employer's proposals requested reduction in total employment costs, and the union position, originally, was the present labor/management agreement should be extended for an additional three-year term.

13. It was not until August 14, 1986, the union submitted its first written proposal to the employer and it basically restated the union's oral proposal of July 16, 1986, to extend the expiring labor/management agreement for an additional term of three years; to which the employer was not amenable.

14. At a negotiating session on August 15, 1986, the union submitted another written pro-

posal wherein it agreed to a 45 cents per hour wage reduction along with other concessions that would result in a reduction in total employment costs, including the wage reduction, of $1.07 per hour.

15. The union proposal. was not acceptable to the employer and the union asked the employer for its best and final offer indicating that it would submit same to the union membership, and the employer, on August 16, 1986, submitted a proposal consisting of a reduction in total employment costs of some $9.00 per hour according to union calculations but less according to employer calculations, and the employer was seeking a five-year labor/management agreement.

16. The employer did not want to extend the labor/management agreement beyond the expiration date of August 16, 1986, but the union requested a thirty-day extension for the purpose inter alia of submitting the employer's final and best offer to the union membership, provided the International President would agree.

17. The employer agreed to a 28-day extension of the labor/management agreement with the understanding that work could continue under the same terms and conditions of the expiring labor/management agreement during the extension period, and the employer expected the union to proceed with dispatch to contact the International, Union President and seek approval, as was required, to submit the employer's final and best offer to the union membership for a vote.

18. The employer further expected the union to promptly report back to the employer as to what was occurring and as to the decision of the

International President and the result of any vote by the union membership if a vote was taken.

19. In any event, the union and the employer agreed on August 16, 1986, to extend the labor/management agreement to September 14, 1986.

20. The International President of the United Steel Workers of America advised the Local 1082 officers and negotiating team on August 26, 1986, he would not approve the contract and would not approve its submission to the membership of Local 1082 for a vote.

21. Local 1082 did not communicate to the employer promptly the decision by the International President, and the employer was not, in fact, advised of same until the next negotiating session on September 10, 1986.

22. At the negotiating session on September 10, 1986, the employer advised the union that it should have been advised at an earlier point in time and that it, the employer, was disappointed that its proposal had not been submitted to the membership for vote.

23. At the same negotiating session on September 10, 1986, the union proposed cost concessions in the total amount of $2.35 per hour and the same was rejected by the employer which, once again, advised the union that its best and final offer of August 16, 1986, was still the employer's offer and if the union did not accept same the employer was unilaterally imposing part of its concession package effective with the end of the last shift on September 13, 1986, and with the beginning of the first shift on September 14, 1986.

24. The union was advised the employer was immediately going to institute, as of September 14, 1986, a $3.50 per hour wage reduction along with $1.00 per hour in other areas and if the same were not acceptable to the union the membership need not report for work on September 14, 1986, and thereafter.

25. The employer advised the union that it would later implement further concessions and cost reductions as of the end of 1986, and as of the end of the five-year labor/management agreement, which the employer was proposing, the total reduction would be in the area of $7.35 per hour.

26. The union had calculated the concessions being demanded by the employer as in the area of $9.00 per hour.

27. The union advised the employer that its imposition of part of its final and best offer reduction package was not acceptable to the union and the union asked the employer to allow work to continue on and after September 14, 1986, under the same terms and conditions of the expired labor/management agreement, and the employer refused this union offer.

28. As of September 14, 1986, the union was willing, and is still willing, to continue working under the terms and conditions of the expired labor/management agreement while negotiations continued; but the employer, as of September 14, 1986, and as of this date, is only willing to allow work to continue under the terms and conditions as established by the employer as of September 14, 1986.

29. Allowing work to continue under the terms of the expired labor/management agreement on

and after September 14, 1986, was unacceptable to the employer because it wished to reduce its financial losses.

30. As of September 14, 1986, the employer not only was implementing a $3.50 per hour wage reduction but was also eliminating certain holidays, was reducing Sunday premium pay, and also making changes in the shift differential and also the manner in which overtime premium was calculated and was also eliminating the earnings protection plan, all of which represented changes in the labor/management agreement that had expired.

31. According to the employer's best estimates it would still be losing money with the aforesaid estimated $4.50 per hour reduction in total employment costs in place as of September 14, 1986, but the amount of the loss would be reduced and would further be reduced when the employer at later points in time implemented other cost reductions in accordance with this final and best proposal.

32. The Token Claimant herein and other bargaining unit employees did not report for work on and after September 14, 1986, as they refused to work under the terms and conditions unilaterally implemented by the employer as of said date, and the bargaining unit employees as of 12:01 a.m. on September 14, 1986, established picket lines and said picket lines were still being maintained as of the date of the Referee's Hearing.

33. There were occasional instances of mass picketing by the members of Local 1082 and they also interfered with ingress and egress to and from the employer's facilities, and the em-

ployer petitioned the Court for an injunction and a Consent Decree was issued by the Court of Common Pleas of Beaver County, PA, on November 7, 1986, wherein mass picketing, interference with ingress and egress, and other matters were covered in the Decree.

34. The employer had begun advertising for permanent replacements for bargaining unit employees on November 2, 1986 after having advised the bargaining unit employees they could return under the revised terms and conditions as established by the employer effective September 14, 1986, but the bargaining unit employees refused to return to work and have continued to picket and continue actively to oppose the employer's efforts to hire permanent replacements.

Generally, our scope of review is limited to a determination of whether the Board committed an error of law or whether the Board's findings of fact are supported by substantial evidence. *Wertman v. Unemployment Compensation Board of Review*, 103 Pa. Commonwealth Ct. 376, 520 A.2d 900 (1987). However, because the question of whether a work stoppage was the result of a strike or lockout for the purposes of determining unemployment compensation benefits is a mixed question of law and fact, *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), "the appellate court must make an independent determination." *Norwin School District v. Unemployment Compensation Board of Review*, 510 Pa. 255, 264, 507 A.2d 373, 378 (1986).

Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), provides:

An employe shall be ineligible for compensation for any week—

. . . .

(d)  In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed. . . . (Emphasis added.)

In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960) the Pennsylvania Supreme Court established the test for determining whether a work stoppage is the result of a strike or lockout:

Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout'. . . .

*Id.* at 444-45, 163 A.2d at 93-94.

Babcock makes three arguments in support of its position that claimants are ineligible for benefits: Babcock maintained the status quo for a reasonable time pending negotiations and bargaining had reached an impasse; there was no withholding of work, no plant closure and no denial of access to the premises and therefore no lockout under federal labor law; and lastly, that Babcock established on the record that its contract offer represented savings necessary and essential to continued operations.

Babcock contends the status quo was maintained for a reasonable time pending negotiations; herein, 28 days;

and that a bargaining impasse was reached. Following *Vrotney,* Pennsylvania Courts have held that a union's offer to continue the pre-existing contract for an unspecified period, or for periods of 30, 60, or 90 days, constitutes a reasonable extension offer under *Vrotney. Unemployment Compensation Board of Review v. Sun Oil,* 476 Pa. 589, 383 A.2d 519 (1978). Babcock agreed to a 28-day extension of the pre-existing labor management agreement to September 14, 1986, with the understanding that work would continue under the same terms and conditions of the expiring agreement (Employer's Exhibit No. 4). At the negotiating session on September 10, 1986, the union proposed cost concessions in a total amount of $2.35 per hour and the same was rejected. Babcock advised the union that its best and final offer of August 16, 1986, was unchanged and if the union did not accept Babcock was unilaterally imposing part of its concession package effective with the end of the last shift on September 13, 1986, and with the beginning of the first shift on September 14, 1986 (Notes of Testimony, November 10 & 11, 1986, (N.T.) at 120-121). According to the union Babcock's proposal would include a concessions package worth in excess of nine dollars per hour per employee (Employer's Exhibit No. 4). On September 11, 1986, the union and Babcock met to discuss insurance coverage and the payment of insurance premiums, and Babcock began preparations for a shutdown (N.T. at 9). The union made a contract proposal, with increased concessions, prior to the work stoppage and offered to maintain the status quo pending further negotiations (N.T. at 11-13).[1]

---

[1] Claimants' counsel to union's witness, Dan Sciarro, a union representative:

QCL:   In other words the Union offered to work under the terms?

ACU1:   We offered to work under the terms of the old contract.

A claimant whose employment has been interrupted by a work stoppage arising out of a labor dispute bears the burden of proving that the stoppage resulted from a lockout. *Bishop v. Unemployment Compensation Board of Review*, 90 Pa. Commonwealth Ct. 553, 496 A.2d 110 (1985). Where a party with the burden of proof prevails

> QCL: Alright, did the company agree to allow Union Members to work under the terms of the old contract?
>
> ACU1: The company wanted to hold some people on overtime at [sic] the expiration of the contract were in an orderly shutdown, they proposed that on September 10.

Referee to union's witness, Sciarro:

> QR: Beyond that?
>
> ACU1: That they wanted to go beyond the midnight of September 13.
>
> QR: I appreciate that, but could you have reported for work on a daily basis after the, on and after September 4, 1986 under the same terms and conditions of the expired contract?
>
> ACU1: No.

(N.T. at 11-12.)

Claimants' counsel to Babcock's witness, Henry E. Doricchio:

> QCL: Mr. Doricchio, you testified earlier concerning the uh negotiating session on Sept. 10, 1986. Did you at that time understand that the union was offering to continue to work beyond Sept. 13 under the terms and conditions of the expired contract?
>
> AEW1: Uh, yes, they had made a written proposal to us on that circuit and gave us a letter.
>
> QCL: And you understood in effect the terms of their offer to continue uh to work under those terms of the expired contract?
>
> AEW1: Yes.
>
> QCL: And you did not in fact agree to allow the union members to continue working as of 9/14/86 under the terms and conditions of that expired contract?
>
> AEW1: Exactly right because we were pleading under those conditions. And we just couldn't tolerate it any longer.

(N.T. at 87.)

before the Board, the findings of fact are conclusive on appeal as long as the record taken as a whole, contains substantial evidence to support these findings. *Avco Corporation v. Unemployment Compensation Board of Review,* 105 Pa. Commonwealth Ct. 316, 524 A.2d 531 (1987). Also, in reviewing a determination of the Board this Court must give every reasonable inference to the party in whose favor the Board has found. *Philco.* In a letter dated August 16, 1986, regarding "Extension Agreement (Beaver Falls Works) Local 1082," Richard E. Woolbert, Vice President of Employee and Public Relations of McDermott, Inc. confirmed the conditions under which he agreed to the union's request for an extension to the labor management agreement which expired on August 16, 1986. This letter demonstrates Babcock's intention to unilaterally implement new terms and conditions:

> In the event the proposed Company's settlement agreement, dated August 16, 1986 (the 'Settlement Agreement'), is not ratified by the membership by midnight September 13, 1986 or in the event no ratification vote is taken by the membership of Local 1082 prior to said date, the Company will implement certain portions of the Settlement Agreement with an effective date of September 14, 1986. Attached hereto is a copy of said provisions which will be implemented on September 14, 1986. You were advised that the Company may from time to time, with advance notice to the Union, implement other portions of the Settlement Agreement.

(Employer's Exhibit No. 4)

The union's intention to continue negotiations is evidenced in a letter to Mr. Woolbert dated September 4, 1986, unconditionally offering to continue working on and after September 13, 1986, under the terms and

conditions of the 1983-1986 agreement, pending the parties' continuing efforts to negotiate a new agreement.[2] The referee and Board found that union met its burden of proving that it was willing to continue working while negotiations continued, and that Babcock rejected this offer.

Babcock's second argument is that because there was no withholding of work, no plant closure, no denial of access to the premises, and no conditioning of the availability of work for employees on the union agreeing to a new collective bargaining agreement or conceding any of its positions for a new labor agreement, there was no lockout under federal labor law. Babcock argues that where a work stoppage does not involve a *literal* locking out of employees by the employer under federal labor law precludes the referee and the Board from categorizing the work stoppage as a lockout under Section 402(d) of the Law. Babcock also contends the award of benefits to claimants would frustrate the federal policy of free collective bargaining by strengthening the economic leverage of labor to the disadvantage of management.

This preemption argument was rejected by the Pennsylvania Supreme Court in *Sun Oil* where the employer argued that the award of benefits to locked out

---

[2] This letter stated:

On behalf of all USW-represented employees employed in bargaining units covered by contract between the USW and Babcock & Wilcox, McDermott, Inc. scheduled to expire on September 13, 1986, the United Steelworkers of America unconditionally offers to continue working on and after September 13, 1986, under the terms and conditions of the 1983-1986 agreement, pending the parties' continuing efforts to negotiate a new agreement. We urge your acceptance of this proposal, as it will give the parties the fullest possible opportunity to resolve their differences and thereby avoid a work stoppage. . . .

(Union's Exhibit No. 8)

employees interferes with the federal regulatory scheme by restricting the employer's use of lockouts in a labor dispute. In holding that Section 402(d) of the Law is preempted by federal labor law, the Court stated: "Thus it is clear that in the absence of further action by the United States Congress, our General Assembly has the right to allow unemployment benefits to locked out employees while denying benefits to striking employees." *Id.* at 593, 383 A.2d at 521. In 1979, the United States Supreme Court held that federal labor law does not preempt a state statute offering unemployment compensation to striking employees. *New York Telephone Company v. New York State Department of Labor,* 440 U.S. 519 (1979).

Babcock's last argument is that it has demonstrated that its offer to have work proceed under new terms and conditions of employment was essential to the continued operation of the company. This Court has held that an employer's alteration of an agreed-upon status quo under an expired contract, even after aiding in its maintenance for a considerable time, constitutes a lockout unless it demonstrates that the action was essential to continued operation. *General Telephone Company of Pennsylvania v. Unemployment Compensation Board of Review,* 100 Pa. Commonwealth Ct. 81, 514 A.2d 264 (1986); *Sun Oil.* Babcock has offered no evidence that the cost of a work stoppage would exceed the cost of a contract extension while negotiations continued. Babcock admitted that its recent losses[3] were also the re-

---

[3] Babcock alleges the Beaver Falls operations had a loss in excess of five million dollars in operating income during the month of August in a letter to its employees stating:

> . . . As we outlined in our letter of August 28, wage and benefit adjustments are tough for everyone involved, but these steps are essential if we are to survive during these difficult times. In fact, during the month of August, the

sult of market conditions and management decisions and could not be attributed solely to the labor contract (N.T. at 118-119). Nor could Babcock suggest that maintenance of the status quo for a reasonable period would result in economic ruin. Babcock's parent corporation, McDermott, Inc. was not only profitable but in a position to offer (approximately one year before the work stoppage) to make a capital investment of 185 million dollars in the Babcock & Wilcox Beaver Falls Works (N.T. at 116-117, Employer's Exhibit No. 21 and Union's Exhibit No. 13). Babcock's justifications for the unilateral implementation of new terms and conditions are factually baseless. The referee and Board properly concluded that Babcock failed to prove the reduction in wages and benefits as of September 14, 1986, was essential to its continued operation.

Accordingly we affirm the Board's determination that Babcock's implementation of its final offer altered the status quo under *Vrotney* and conclude that the Board's findings are supported by substantial evidence.

### ORDER

AND NOW, September 20, 1988, the orders of the Unemployment Compensation Board of Review at Nos. B-257296 and B-257297, dated April 10, 1987, are affirmed.

---

Beaver Falls operations had a loss in excess of $5 million in operating income. . . .
(Employer's Exhibit No. 4)