604 A.2d 1216

**TEXTRON LYCOMING, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 17, 1991.

Decided March 4, 1992.

Reargument Denied April 23, 1992.

194

Brian Steinbach, for petitioner.

No appearance for respondent.

Quintes D. Taglioli, for intervenors McCowan, Emig and Shaffer.

Before SMITH and PELLEGRINI, JJ., and BARBIERI, Senior Judge.

SMITH, Judge.

Textron Lycoming (Employer) petitions for review of orders of the Unemployment Compensation Board of Review (Board) which affirmed the referee's order granting benefits to William McCowan, Linda Emig, and Paul R. Shaffer, representative Claimants and members of Local 787, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Union), under Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d).[1] The questions presented by Employer are whether the parties reached an impasse in their labor negotiations; whether Employer maintained the status quo for a reasonable period of time; whether Claimants and the Union bear a responsibility for the work stoppage; and whether Claimants are ineligible for benefits.

 The Board made the following pertinent findings of fact:

1. Section 402(d) of the Law provides in pertinent part: "An employe shall be ineligible for compensation for any week ... (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed...."

3. A collective bargaining agreement was in existence between employer and union with an expiration date of April 20, 1990.

4. Negotiations for a new collective bargaining agreement began on March 5, 1990.

5. Despite negotiations, no new agreement could be reached prior to the existing contract's expiration.

6. The parties agreed to continue work under the existing contract following its expiration.

7. During the negotiating process, the parties first dealt with noneconomic issues.

8. Upon the resolution of the majority of the noneconomic issues, the parties began bargaining on economic issues on or about April 13, 1990.

9. By early June 1990, the most important unresolved issue was a new health care plan.

10. Employer's proposed health care plan included an across-the-board deductible and an 80/20 co-pay system wherein the employee would be responsible for 20% of the medical costs per individual in excess of $3,000 and the employer would be responsible for 80% of the diagnostic-related grouping (DRG) charges.

11. On June 11, 1990, employer notified the union that it considered the expired agreement to be of no further force and effect, thereby discontinuing payroll deductions for union dues and unilaterally changing the grievance procedure.

12. Despite these unilateral changes by the employer, the union membership continued to work under the changed terms and conditions of employment.

13. The parties continued negotiations after June 11, 1990, concerning the health care plan, with the union requesting further information surrounding the proposed plan.

14. On June 21, 1990, employer and union met at a negotiating session wherein the union reiterated its request for further information; specifically, the union wanted to know costs associated with the DRG.

15. Employer responded that it could not provide cost information on the DRG as the health provider, Blue Cross, considered that priority information.

16. At this meeting, the employer presented to the union its final offer.

17. The union desired to meet with Blue Cross representatives in an attempt to develop counter proposals that may have been acceptable to the employer.

18. The employer intended to attend this meeting and, accordingly, the union cancelled the meeting, deferring same for two to three weeks.

19. The parties continued to negotiate following the employer's final offer of June 21, 1990, and on July 11, 1990, employer presented the union with a revised final offer.

20. The revised final offer included the implementation of the proposed health care plan, effective August 1, 1990.

21. Employer indicated that if the July 11, 1990, offer was not accepted by July 25, 1990, it would consider negotiations deadlocked.

22. Following the employer's final offer, the union again requested information from the employer concerning specific cost amounts for its members under the proposed health care plan. The information was not provided to the union.

23. On July 31, 1990, the union offered, in writing, to continue working under the same terms and conditions of the expired contract, with the June 11, 1990, modification, while negotiations continued.

24. On August 1, 1990, employer unilaterally implemented the new health care plan.

25. In response to the unilateral implementation of the new health care plan, the union initiated a work stoppage.

26. Negotiations between the parties continued following the inception of the work stoppage, and on October 5, 1990, a tentative agreement was reached which included a health care plan that differed from the employer's unilat-

erally implemented plan and the plan under the expired contract.

27. The tentative agreement was ratified by the union's membership on October 10, 1990.

28. The union negotiators attended all scheduled negotiating meetings and were willing to continue negotiations while work continued under the expired contract.

Decision of the Board, pp. 1–3. The Board concluded that Claimants were eligible for unemployment compensation benefits since Employer was the first to alter the status quo and that based on the Board's findings an impasse had not been reached.[2]

The Pennsylvania Supreme Court developed the following test to determine if a work stoppage is a lockout or a strike:

Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444–45, 163 A.2d 91, 93–94 (1960). In *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 105 n. 2, 242 A.2d 454, 456 n. 2 (1968), the *Vrotney* test

2. This Court's scope of review is limited to determining whether the findings of fact are supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated. *Wertman v. Unemployment Compensation Board of Review,* 103 Pa.Commonwealth Ct. 376, 520 A.2d 900 (1987). The question of whether a work stoppage was caused by management or the union for purposes of unemployment compensation benefits is a mixed question of law and fact. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 105 n. 2, 242 A.2d 454, 456 n. 2 (1968).

was refined to require a determination as to which side "first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." *Id.*, 430 Pa. at 103, 242 A.2d at 455.

Employer relies upon *Local 730, United Ass'n of Journeymen & Apprentices of Plumbing & Pipe–Fitting Indus. v. Unemployment Compensation Board of Review*, 505 Pa. 480, 489 n. 5, 480 A.2d 1000, 1005 n. 5 (1984), which stated:

> *Vrotney* by its express language qualified the length of time during which this status quo must be maintained by stating: 'has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment....' *Vrotney Unemployment Case*, 400 Pa. 440, 444, 163 A.2d 91, 93 (1960). Where it is evident that an impasse has been reached or good faith bargaining is impossible, *Vrotney* by its own terms is inapplicable.

Employer maintains that it agreed to permit work for a reasonable time and that the inability to agree on the outstanding health care plan represented an impasse in negotiations, as described in *Local 730, United Ass'n of Journeymen*, which alleviated Employer's burden to continue under the preexisting agreement. Employer relies on the definition of impasse provided in *Norwin School Dist. v. Belan*, 510 Pa. 255, 267 n. 9, 507 A.2d 373, 380 n. 9 (1986):

> [T]hat point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless—but its application can be difficult. [P]erhaps all that can be said with confidence is that an impasse is a 'state of facts in which the parties, despite the best of faith, are simply deadlocked.'
>
> An employer may, after bargaining with the union to a deadlock or impasse on an issue, make unilateral changes that are reasonably comprehended within his pre-impasse proposals.... Another formulation is that after an impasse reached in good faith, the employer is free to

institute by unilateral action changes which are in line with or which are no more favorable than those it offered or approved prior to impasse.

Although this Court adopted the *Norwin* definition of impasse in *Teledyne Vasco v. Unemployment Compensation Board of Review,* 119 Pa.Commonwealth Ct. 583, 547 A.2d 841 (1988), it has consistently followed the rule enunciated in *Vrotney* and requires a strong showing that the parties have reached an impasse which would eliminate the burden to maintain the status quo. *See Grinnell Corp. v. Unemployment Compensation Board of Review,* 127 Pa.Commonwealth Ct. 298, 561 A.2d 843 (1989), *appeal denied,* 525 Pa. 613, 577 A.2d 545 (1990).

It is clear that any application of an impasse defense is fact sensitive. Here, the Board found that the first change in the status quo occurred on June 11, 1990 when Employer unilaterally discontinued payroll deductions for union dues and changed the grievance procedure. The Board further found that the most important unresolved issue during June was the health care plan, not the dues checkoff or the grievance procedure. There is no evidence in the record that either of these two issues was the cause of an impasse in the negotiations. Moreover, the Board concluded that based on its findings, there was no impasse when Employer changed the health care plan on August 1, 1990.

The record in the matter sub judice fails to show that an impasse existed when Employer unilaterally altered the status quo on June 11, 1990 as the parties were not "deadlocked" in their negotiations. Employer contends however that termination of the dues check-off provision or alteration of the employee grievance procedure had no practical effect on the employees' terms and conditions of work. Employer's contention is unpersuasive. There are few items which have as much relevance to an employee as the number and amount of payroll deductions. Further, eliminating the check-off provision is a significant alteration in the Union's method of collecting dues from its members, and the elimination of arbitrability

questions from the grievance procedure is likewise a significant change in the employment contract dispute settlement mechanism. Furthermore, the fact that the Union membership continued to work after Employer's unilateral changes does not constitute the Union's acceptance of those conditions. *See Local 730, United Ass'n of Journeymen; Burk v. Unemployment Compensation Board of Review,* 119 Pa.Commonwealth Ct. 360, 547 A.2d 497 (1988), *appeal denied,* 522 Pa. 585, 586, 559 A.2d 528, 529 (1989). Thus, Employer's modifications to employee terms and conditions of employment prior to reaching an impasse constituted unilateral changes in the status quo for which Employer must bear responsibility.

 Employer argues that it continued to allow work under the status quo until August 1, 1990 when it implemented its proposed health care plan. This contention ignores the Board's findings of fact and Employer's own admissions. Specifically, the Director of Human Resources, John Norton, testified on direct examination:

EL Mr. Norton, I show you what's been marked as Employer's 5. If you tell us what that is.

EW That is a letter that was delivered to the union on June 11th, signed by myself. ... And that is the notification to the union that the company did not consider the then—you know, working day to day, under that particular labor agreement of any further force or affect.

EL Did the company make any changes at that time?

EW Yes, there were as I recall two changes made. One dealing with union dues deductions. Dues check off, the company discontinued a dues check off. And the company, also any grievances that would have occurred on or after that date, the company would have—had the union—had the grievances gone through the grievance procedure and made it up to the arbitration step of the grievance procedure, the company reserved the right to determine the arbitrability of individual grievances—

grievances as they would have come up, although none did.

N.T., p. 18. The subsequent work stoppage after the second unilateral change to the status quo on August 1, 1990 is a classic example of a lockout under *Vrotney* because Employer was the sole party responsible for these changes and the Union was willing to continue working under terms and conditions of the pre-existing contract to avoid a work stoppage.[3]

██ Finally, Employer makes various references in its brief to perceived inaccuracies in the Board's findings of fact. It is not the function of this Court to weigh the evidence presented to the Board or to act as a factfinder. When a party with the burden of proof has prevailed before the Board, as is the case here, the findings of fact are conclusive on appeal so long as the record taken as a whole contains substantial evidence to support those findings. *Babcock & Wilcox Co. v. Unemployment Compensation Board of Review*, 119 Pa.Commonwealth Ct. 566, 547 A.2d 850 (1988), *appeal denied*, 523 Pa. 637, 565 A.2d 446 (1989). The testimony in the record provides substantial evidence for the findings of the Board in this matter. The Board's order is therefore affirmed.

## ORDER

AND NOW, this 4th day of March, 1992, the order of the Unemployment Compensation Board of Review is affirmed.

3. *See also Unemployment Compensation Board of Review v. Sun Oil Co. of Pennsylvania,* 476 Pa. 589, 383 A.2d 519 (1978), *appeal dismissed,* 440 U.S. 977, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979), *reh'g denied,* 441 U.S. 968, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979) (employer implemented changes five weeks after the expiration of the contract); *Orr v. Unemployment Compensation Board of Review,* 120 Pa.Commonwealth Ct. 45, 548 A.2d 360 (1988), *appeal denied,* 522 Pa. 605, 607, 562 A.2d 828, 829 (1989) (where this Court rejected employer's contention that an impasse was reached after maintaining the status quo for ten months); and *Babcock & Wilcox,* (where this Court rejected employer's claim that it maintained the status quo for a reasonable time, twenty-eight days, before implementing certain unilateral changes although the union was willing to continue negotiations).