POPE & TALBOT, INC., Petitioner,

v.

UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW, Respondent
(Two Cases).

Commonwealth Court of Pennsylvania.

Argued Sept. 17, 1998.
Decided Oct. 29, 1998.

Richard M. Goldberg, Wilkes–Barre, for petitioner.

Quintes D. Taglioli, Allentown, for respondent.

Before FRIEDMAN and FLAHERTY, JJ., and McCLOSKEY, Senior Judge.

FRIEDMAN, Judge.

Pope & Talbot, Inc. (Employer) appeals from an order of the Unemployment Compensation Board of Review (UCBR) affirming the decision of the referee to grant unemployment compensation benefits to Alan C. Haas and John J. Garrison, Sr., representative claimants of a class of claimants (Claimants) employed by Employer.[1] The referee and the UCBR determined that Claimants were eligible for benefits pursuant to section 402(d) of the Unemployment Compensation Law (Law)[2], 43 P.S. § 802(d), because their

petition for representation for a period of one year up to a maximum period of three years.

1. Haas represents approximately 350 Claimants. Garrison is the alternate representative Claimant.

2. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(d). That section provides in pertinent part:

An employe shall be ineligible for compensation for any week –
(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed . . . .

unemployment was due to a work stoppage which existed as a result of a lockout and not a strike.

Claimants are represented by Local 1448 of the United Paperworkers International Union (Union). The Union and Employer were parties to a collective bargaining agreement (CBA) which commenced September 30, 1991 and remained in effect until September 16, 1994, thereafter extending year-to-year unless terminated by either party through a written ten day notice. (UCBR's Findings of Fact, No. 2.) The parties began collective bargaining negotiations for a successor CBA on August 31, 1994, but, from September 16, 1994 until their last day of work on April 28, 1995, Claimants continued to work under the terms and conditions of the expired CBA. (UCBR's Findings of Fact, Nos. 1, 3.) During that time, the parties met periodically to negotiate a new CBA,[3] (UCBR's Findings of Fact, Nos. 4–9), with Employer presenting its final proposal on March 23, 1995.

On April 14, 1995, following the Union's rejection of Employer's final proposal, Employer notified the Union that Employer believed the parties were at an impasse and, therefore, Employer intended to implement its final proposal effective April 29, 1995. (UCBR's Findings of Fact, Nos. 10, 14; R.R. at 88a.) In response, the Union notified Employer that the Union did not believe the parties were at an impasse and offered to continue working under the terms of the expired CBA. (UCBR's Findings of Fact, No. 15; R.R. at 89a.) The parties met again on April 27, 1995, and, at the conclusion of the meeting, a Union representative delivered a letter to Employer, again offering to maintain the status quo and work under the expired CBA. (UCBR's Findings of Fact, Nos. 16–18.) Employer rejected the Union's offer indicating that, while work was available under the implemented terms and conditions of Employer's final offer, work would no longer be available under the terms of the old CBA. (UCBR's Findings of Fact, No. 19.) Claimants continued working until midnight April 29, 1995, at which time the work stoppage commenced.[4] (UCBR's Findings of Fact, Nos. 20, 23.)

After the work stoppage began, Claimants sought unemployment compensation benefits. Although Claimants and Employer both appeared before the referee on the question of Claimants' entitlement to benefits, the referee precluded Employer from producing evidence regarding the parties' negotiations prior to the work stoppage as a means for Employer to establish the basis upon which it decided to alter the status quo. The referee awarded benefits to Claimants, concluding that they were eligible for unemployment compensation because the work stoppage was a lockout within the meaning of section 402(d) of the Law. On appeal, the UCBR affirmed the award of benefits without comment.

Employer then appealed to this court,[5] and, in an order and opinion filed December 17, 1996, we vacated the UCBR's orders and remanded for the taking of additional evi-

---

3. At meetings in September 1994 through November 30, 1994, the parties negotiated contract language. Employer then delayed further negotiations until March 1995 to see the effects of its Reduction in Force program; when negotiations resumed on March 1, 1995, a federal mediator conducted the meetings. It was at the March 1, 1995 meeting that Employer first presented its economic proposals to the Union, and at meetings on March 2 and 3, 1995, the Union presented its counter proposals. Although Employer presented its final proposal when it next met with the Union on March 22 and 23, 1995, the parties also held further negotiation sessions on March 25, 27 and 29, 1995. On April 1, 1995, the Union voted to reject Employer's final offer and authorized a strike. (UCBR's Findings of Fact, Nos. 4–10.)

4. On that date, the Union established and maintained picket lines at the Pittston and Ransom work sites. Employer subsequently cancelled negotiating sessions that had been set for May 10, 11 and 12, 1995, but began negotiating with the Union again in June 1995. On December 4, 1995, approximately six months after negotiations restarted, the Union ratified a new CBA with Employer. (UCBR's Findings of Fact, Nos. 21–22.)

5. Employer also filed a request for reconsideration, which the UCBR denied. Employer actually filed two appeals to this court, one from the UCBR's order affirming the referee's award of benefits to Haas, and one from the order affirming the grant of benefits to Garrison. This court consolidated both appeals. (R.R. at 146a.)

dence, previously disallowed by the referee, with respect to Employer's argument that Claimants were ineligible for benefits under section 402(d) of the Law because the parties had reached an impasse in negotiations and because Employer had bargained for a reasonable period of time under the terms of the expired CBA. *Pope & Talbot, Inc. v. Unemployment Compensation Board of Review*, 686 A.2d 893 (Pa.Cmwlth.1996). In addition, however, we rejected Employer's argument that it be allowed to present evidence as to the futility doctrine.[6] *Id.* We determined that the futility doctrine applied only to unions and did not apply to employers; further, we concluded that, even if applicable, Employer would not prevail under this doctrine. *Id.*

On remand, the UCBR conducted further hearings at which both parties presented testimony. The UCBR then considered the augmented record and, on August 22, 1997, vacated the prior orders and issued new findings. Based on those findings, the UCBR determined that the parties had not reached an impasse in negotiations and that Employer had not allowed work to continue under the expired CBA terms and conditions for a reasonable period of time before altering the status quo. Consequently, the UCBR again concluded that the work stoppage was a lockout, rendering Claimants eligible for benefits under section 402(d) of the Law.

On appeal to this court,[7] Employer contends that, under the particular circumstances in this case, it was unreasonable for the UCBR to require Employer to continue to offer employment to Claimants under the expired CBA. Thus, Employer argues that the UCBR erred in awarding benefits to Claimants based on the determination that the work stoppage was a lockout rather than a strike. We disagree.

Section 402(d) of the Law provides that an employee is ineligible for unemployment compensation benefits for any week in which his unemployment is due to a work stoppage that exists because of a labor dispute *other than a lockout*. In *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 444–45, 163 A.2d 91, 93–94 (1960), our supreme court enunciated the test for determining whether a work stoppage is a lockout, for which the employer is responsible, or is a strike, which is the responsibility of the employees, stating:

> when the contract has in fact expired and a new agreement has not yet been negotiated, the sole test under section 402(d) of the Law...is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" and the disqualification for unemployment compensation benefits in the case of a "stoppage of work because of a labor dispute" does not apply.

■ In other words, the party changing the status quo after the expiration of a CBA is deemed to have caused the work stoppage. *Id.* Here, it is undisputed that Employer altered the status quo when it unilaterally

---

6. Under the futility doctrine, a *union* may be excused from its burden of offering to continue working under the terms of an expired collective bargaining agreement where it is apparent that management would reject such an offer. *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968).

7. Generally, our scope of review is limited to determining whether constitutional rights were violated, whether errors of law were committed, or whether the findings of fact are supported by substantial evidence. *Wertman v. Unemployment Compensation Board of Review*, 103 Pa.Cmwlth.

376, 520 A.2d 900 (Pa.Cmwlth.1987). However, the question of whether a work stoppage was caused by management or by the union, for purposes of determining eligibility for unemployment compensation benefits, is a mixed question of law and fact. *Textron Lycoming v. Unemployment Compensation Board of Review*, 146 Pa. Cmwlth. 193, 604 A.2d 1216 (Pa.Cmwlth.1992). Thus, in reviewing such a decision, the appellate court must make an independent determination. *Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986).

**1128**

implemented its final proposal, effective April 29, 1995, and would not allow the Union to continue working under the terms and conditions of the preexisting CBA as the Union had offered to do. Nevertheless, Employer argues that the implementation of its final offer did not act to qualify Claimants for benefits because, under the facts of this case, at the time Employer implemented its final offer (a) Employer had permitted work to continue under the terms of the expired CBA for a reasonable period of time, and (b) the parties had reached an impasse, making good faith bargaining impossible.[8]

To support its argument, Employer relies largely on *Local 730, United Association of Journeymen and Apprentices of Plumbing ans Pipe-Fitting Industry v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984), in which our supreme court considered an employer's suggested modification of the *Vrotney* test. In rejecting the proposed modification, the court further clarified an employer's obligation to maintain the status quo under the language in *Vrotney*, stating:

Nor can it legitimately be argued that the *Vrotney* rule is unfair to the [e]mployer in that it could conceivably require the employer to continue under the terms of the preexisting contract into perpetuity. *Vrotney* by its express language qualified the length of time during which this status quo must be maintained by stating: "has the

employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment. . . ." Where it is evident that an impasse has been reached or good faith bargaining is impossible, *Vrotney* by its own terms is inapplicable.

*Id.* at 489 n. 5, 480 A.2d 1000, 1005 n. 5 (citation omitted).

Employer contends that by maintaining the status quo for seven and one-half months while negotiations continued, it fully complied with the requirement set forth in *Vrotney* to allow work to continue under the terms and conditions of the expired CBA for a *reasonable* period of time before altering the status quo. In describing those circumstances which Employer claims demand reversal,[9] Employer first asserts that, because it was facing a difficult economic situation, Employer made it plain from the outset of negotiations that its objective was to make the company viable and competitive within the industry, and, to this end, Employer articulated to the Union that employee concessions would be absolutely necessary in both operational and economic areas.[10] Nevertheless, Employer claims that the Union made almost no concessions during the twenty-four negotiating sessions between August 31, 1994 and November 30, 1994, and, at the time of the work stoppage, in excess of 100 agenda items remained open, including critical issues

---

**8.** Where, as here, a work stoppage takes the form of a strike and a constructive lockout is alleged, the claimants bear the burden of proving that they offered to continue working under the status quo, and that the employer rejected that offer. *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988). Once the union makes the offer to continue the status quo, the employer has the burden to respond in good faith if it desires to avoid a lockout. *See Mountain View School District v. Unemployment Compensation Board of Review*, 59 Pa.Cmwlth. 510, 436 A.2d 1225 (Pa.Cmwlth.1981). Here, the Union offered to continue working under the preexisting CBA terms; however, Employer refused to permit work to continue under those expired terms pending further negotiations. Thus, Employer's implementation of its final proposal with terms different from the expired CBA constitutes a lockout within the meaning of section 402(d) of the Law unless Employer can establish that it maintained the status quo for a reasonable period of time or that the parties had

reached a bargaining impasse. *Local 730, United Association of Journeymen and Apprentices of Plumbing and Pipe-Fitting Industry v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984).

**9.** Employer bases its argument on the testimony of Winsor Jenkins, Employer's corporate manager of industrial relations and organizational development, and Joseph Martin, Employer's Human Resource Manager.

**10.** Negotiations were essentially divided into two parts, non-economic and economic. The non-economic negotiations began in late August 1994 and terminated November 30, 1994. (R.R. at 218a.) Employer's non-economic agenda included, among other items, changes to its substance abuse policy, pension system, holiday and vacation structure, sickness and accident benefits, absenteeism policy and work redesign to team based concepts.

on which there had been no movement toward resolution. In addition, Employer stresses that it was spending up to $150,000 per month to continue to operate under the terms and conditions of the expired CBA. Given this situation, Employer argues that it was exceedingly reasonable, in fact generous, to extend employment under the expired CBA terms for seven and one-half months before implementing its final offer.

Employer also asserts that, under the facts existing at the time it implemented its final offer, it is evident that negotiations between the parties had reached an impasse, that good faith bargaining was no longer possible and that further negotiations would have been fruitless. See *Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986) (defining impasse as the point at which the parties have exhausted their prospects of reaching an agreement, making further negotiations fruitless). Although conceding that the parties continued to negotiate *after the work stoppage*, Employer asserts that the only relevant question here is whether an impasse existed *at the time of the work stoppage*. To support its position that an impasse existed between the parties *at the time of the work stoppage*, Employer points out that, after the stoppage began, the parties still required more than twenty negotiation sessions over the course of seven months before they finally arrived at a new CBA. Employer's arguments cannot prevail.

Here, Employer urges us to accept its version of the facts, stressing that negotiations stretched over a period of seven and one-half months, during which time virtually no movement was made toward resolving critical contract issues. Based on these circumstances, Employer would have us determine that it was entitled to unilaterally implement its final proposal without qualifying Claimants for benefits because Employer had maintained the status quo for a reasonable time and the parties had reached a bargaining impasse; however, several factors dictate against this result.

Employer implies that it negotiated *consistently* for seven and one-half months without success; [11] in actuality, the parties negotiated strictly non-economic issues from August through November of 1994 and, at Employer's request, held no negotiations at all for three months, resuming bargaining on March 1, 1995, when Employer made an economic proposal for the first time. Employer then participated in only five bargaining sessions before presenting its final proposal on March 23, 1995. Therefore, bargaining in general took place over a period of less than four months, and, with respect to economic issues, negotiations spanned only twenty-three days. Moreover, although progress was slow, both parties were altering their positions throughout, and even after, the negotiation process. In addition, as both parties note, the negotiations here were not typical because, from the outset, Employer was looking for concessions while the Union's opening position was for a raise. It is reasonable to assume that the type of drastic changes sought by Employer required more time to negotiate, particularly when initial face-to-face negotiations were replaced later by bargaining sessions conducted by federal mediators.

Further, although an employer is not required to maintain the status quo indefinitely, courts have required an extremely strong showing that the parties have reached an impasse which would eliminate the burden to maintain the status quo. *Grinnell v. Unemployment Compensation Board of Review*, 127 Pa.Cmwlth. 298, 561 A.2d 843 (Pa. Cmwlth.1989), *appeal denied*, 525 Pa. 613, 577 A.2d 545 (1990). Accordingly, any application of an impasse defense is very fact sensitive. *Textron Lycoming v. Unemployment Compensation Board of Review*, 146 Pa.Cmwlth. 193, 604 A.2d 1216 (Pa.Cmwlth. 1992). Here, many of the facts indicate that the parties had not reached an impasse, for example: (a) Employer submitted a final proposal on March 23, 1995, but then held further negotiations before notifying the Un-

11. The Union points out that, technically, the CBA did not really expire on September 16, 1994, but continued year-to-year after that date until terminated by Employer on April 14, 1995; therefore, the Union asserts that it could argue that only thirteen days, rather than seven and one-half months, elapsed from the expiration of the CBA until Employer altered the status quo on April 29, 1995.

ion of an impasse on April 14, 1995; (b) both parties adjusted their demands after the final proposal and prior to the work stoppage; (c) following its final proposal, but before issuing the letter declaring an impasse, Employer had agreed to hold negotiating sessions in May of 1995; (d) the Union was consistently willing to continue working under the old CBA while negotiating a new CBA; (e) although Employer implemented its final proposal on April 29, 1995, it acknowledged in its April 27, 1995 written communication that a future settlement was a possibility;[12] (f) the parties eventually reached an agreement after restarting bargaining during the work stoppage; and (g) Employer proposed drastic changes that were concessionary in nature and, thus, needed more time than usual for negotiations.

■ Based upon these facts and the law requiring a strong showing to establish that an impasse exists, we conclude that Employer failed to prove that the parties had reached an impasse at the time Employer changed the status quo. Accordingly, for purposes of unemployment compensation, the UCBR correctly deemed the work stoppage to be a lockout, thereby rendering Claimants eligible for benefits under section 402(d) of the Law.

Employer also contends that, contrary to this court's holding in our prior opinion in this case, the futility doctrine should apply to employers as well as to unions. Moreover, Employer asserts that, under that doctrine, Employer was relieved of its burden to maintain the status quo because it would have been futile to continue to negotiate with the Union and continue to offer employment under the terms and conditions of the expired CBA. Employer's argument is both improperly raised and incorrect.

■ This court previously addressed, and rejected, Employer's futility doctrine argument in our decision remanding this matter to the UCBR. In that opinion, we limited remand to a consideration of whether the parties had reached an impasse and whether Employer conducted negotiations for a reasonable period of time to avert a work stoppage. We did not remand for consideration of the futility doctrine's applicability, and the UCBR properly did not address the matter on remand. When an appellate court has considered and decided a matter submitted to it on appeal, it will not, upon a subsequent appeal on another phase of the case, reverse its previous ruling. Instead, the issue decided becomes the law applicable to the case and the appellate court will not reconsider it. *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 100 A.2d 595 (1953). Because this court has already decided the question of whether the futility doctrine is applicable to relieve an employer from accepting an offer of its employees to work under the status quo, we cannot and will not reconsider that issue.

Further, even if we were to address the question again, we see no reason to decide the matter differently than we did previously.[13] Indeed, Employer does not even seem to be arguing the futility doctrine as that term is generally treated. Rather, Employer merely seems to repeat its prior arguments that it had negotiated for a reasonable period of time and had reached an impasse, making it futile to continue negotiations and offer employment under the terms of the expired agreement. We already have considered and rejected this argument.

Accordingly, we affirm.

### ORDER

AND NOW, this 29th day of October, 1998, the orders of the Unemployment Compensa-

---

**12.** Employer's written communication, dated April 27, 1995, listed those contract sections from its final proposal that were being implemented, and listed those sections which were not being implemented, but which would be incorporated "if an agreement is reached between the Company and the Union." (R.R. at 447a–48a.)

**13.** In our prior opinion, we stated that "[u]nder the futility doctrine a *union* may be excused from its burden of offering to continue working under

the terms of the expired agreement where it is apparent that such an offer would be rejected by management. The futility doctrine is inapplicable to Employer, however, as that doctrine applies to unions. Moreover, it would not have been futile for Employer to ask Claimants to maintain the status quo as Claimants had already announced their willingness to do so." *Pope & Talbot, Inc.*, 686 A.2d at 896 (citation omitted).

tion Board of Review, dated August 22, 1997, are hereby affirmed.